IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JEMIKA JOHNSON,

and

ESTATE OF BABY BOY JOHNSON,

*Plaintiffs,*

v.

RAPPAHANNOCK REGIONAL JAIL AUTHORITY, and KEVIN HUDSON, CORPORALS PAUL WALLACE, MARIA REID, and LIEUTENANT CHRISTOPHER CANDLER, and OFFICERS TONY COLES, JAMES ROBINSON, MARIA ODONKOR, TERESA PADGETT, JACKSON, O'CONNOR, ADEKOYE, TERRENCE SHELL, and SERGEANTS CONNOLLY, BROWN, CHRISTOPHER EPLING, TEYE, and MARK TAYLOR, and Correctional Officers Does 1-10;

and

RAPPAHANNOCK CREATIVE HEALTH CARE, and PETER C. OBER, BARBARA MEADE, AMANDA FISHER, MHNP, LAURA HEDDEN, RN, HELENA SANGOE, LPN, EDWARD ADUSEI, LPN, and MEDICAL OFFICERS COLEMAN, PAYNE, and Medical Does 1-10;

*Defendants.*

**Case No._________________**

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW the Plaintiff, Jemika Johnson, by counsel, and alleges as follows:

## I. INTRODUCTION

1. When Jemika Johnson ("Ms. Johnson" or "Plaintiff") arrived at Rappahannock Regional Jail ("RRJ" or "the Jail") on May 19, 2021, she was approximately four months pregnant. Just ten weeks later, she left RRJ after giving birth alone in her isolation cell, without medical assistance or medication. Her baby died in her arms before anyone at RRJ even noticed she had given birth.

2. Individuals employed or contracted to provide medical services at RRJ confirmed her pregnancy through a positive pregnancy test on June 21, 2021. Those same individuals also knew of Ms. Johnson's diagnosis of Schizophrenia and her history of severe mental health issues that required management through psychiatric medication. Despite this knowledge and ongoing symptoms of psychosis documented by RRJ's correctional officers and medical staff, Ms. Johnson remained completely unmedicated, was never seen by a licensed psychiatrist, and never received a prenatal examination. Instead, Ms. Johnson was placed in isolated confinement for behavioral issues, where her physical and mental state deteriorated for the duration of her time at RRJ.

3. At approximately 2:00 a.m. on August 3, 2021, Ms. Johnson went into premature labor, alone in her cell. She screamed for help. No one answered. Ms. Johnson then gave birth alone in her cell, and saw her newborn child breathing and alive. Still, no one came to help her. She repeatedly pressed the emergency call button but did not receive a response.

4. Over five hours later, at 7:11 a.m., Corporal Paul Wallace finally checked on Ms. Johnson and found her and her infant child in a pool of blood. Ms. Johnson and the infant were taken to the hospital, where her infant child was pronounced dead.

5. The hospital determined Ms. Johnson was in the midst of an active psychotic break. Once she was stabilized, she was transferred to Western State Hospital for mental health treatment.

6. An autopsy of her child revealed that the cause of the child's death was an infection, acute chorioamnionitis—a common condition which would have been identifiable and easily treatable with antibiotics, if Ms. Johnson had received medical care.

7. The instant lawsuit brings claims against Defendants for violating the Constitutional, Civil, and Statutory rights of Jemika Johnson and her deceased infant child, Baby Boy Johnson, causing Ms. Johnson and her infant child to suffer damages, injuries, and ultimately the infant child's death. While under Defendants' care and custody, Ms. Johnson and her infant child were subjected to inadequate and unconstitutional medical and psychiatric health care which involved the wanton and unnecessary infliction of pain.

## II. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, as the action asserts claims arising under the U.S. Constitution and federal civil rights laws of the United States. Jurisdiction is also conferred by 42 U.S.C. § 1983 for violations of Plaintiff's rights under the United States Constitution.

9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims under state laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

10. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants are subject to the personal jurisdiction of this Court and the events giving rise to the claims occurred in Stafford County in Virginia.

## III. PARTIES

### A. Plaintiffs

11. Plaintiff Jemika Johnson ("Plaintiff" or "Ms. Johnson") is a 27-year-old adult citizen of the United States. At all times material hereto, Ms. Johnson was a pretrial detainee being held at the Rappahannock Regional Jail in Stafford County, Virginia, and was entitled to all rights, privileges, and immunities accorded as a resident of the Commonwealth of Virginia, and as a citizen of the United States. At all material times hereto, Ms. Johnson was pregnant while being detained at the Rappahannock Regional Jail under the direct custody, control and supervision of the Defendants.

12. Plaintiff, the Estate of Baby Boy Johnson, represents the unnamed decedent whose serious medical needs were ignored and neglected while he was in the custody and under the care/control of Defendants, all of which the Plaintiffs relied upon to provide adequate medical care. As a result, Baby Boy Johnson died in the very same place he was born, in a cell at Rappahannock Regional Jail. At all times material hereto, Baby Boy Johnson was entitled to all rights, privileges, and immunities accorded by the Constitution of the United States.

### B. Defendants

13. Rappahannock Regional Jail Authority ("RRJA") oversees the operations of Rappahannock Regional Jail ("RRJ" or "the Jail"), an adult correctional facility in Stafford, Virginia, operated to serve Stafford, Spotsylvania and King George counties as well as the City of Fredericksburg. Under Va. Code. § 53.1-95.7, RRJA is "an instrumentality exercising public and essential governmental functions" that can be sued in its own name.

14. Defendant, Superintendent Kevin Hudson, is an adult citizen of the United States and a resident of the Commonwealth of Virginia. At all times material hereto, Defendant Hudson

was the Superintendent of the Rappahannock Regional Jail and was ultimately responsible for the health, safety, security, welfare and humane treatment of all inmates at RRJ, including Ms. Johnson and her infant child. At all times material hereto, Defendant Hudson oversaw, supervised and had direct control over the management and operations of RRJ, and was responsible for the Jail's policies and procedures, as well as training. At all times material hereto, Defendant Hudson had control and authority over the RRJ's contract with Defendant Rappahannock Creative Health Care. At all times material hereto, Defendant Hudson was deliberately indifferent to the serious medical needs and Constitutional rights of Ms. Johnson and her infant child and ignored the Jail's staff's lack of sufficient training in policies and procedures, both written and unwritten, to adequately address inmates in need of medical and psychiatric care, including Ms. Johnson. Defendant Kevin Hudson is sued in his individual capacity based on supervisory liability.

15. Upon information and belief, Defendants Corporal Paul Wallace, Lieutenant Christopher Candler, Corporal Maria Reid, Officer Tony Coles, Officer James Robinson, Officer Maria Odonkor, Officer Teresa Padgett, RRJ Officer Jackson, RRJ Officer O'Connor, RRJ Officer Adekoye, Officer Terrence Shell, and Defendant Officers 1-10 (collectively, "Officer Defendants"), were employees, officers, or deputies of the Rappahannock Regional Jail (RRJ), located in Stafford, Virginia, between May 19, 2021 and August 3, 2021. Officer Defendants were employed by the Jail and acting under the color of state law at all times relevant to the events in this Complaint. At all times material thereto, Officer Defendants were responsible for the health, safety, security, welfare and humane treatment of all inmates at the Jail, including Ms. Johnson and her infant child. Officer Defendants are sued in their individual capacities.

a. Defendant Corporal Paul Wallace was the Administrative Segregation Corporal on the night of August 2, 2021 into the early morning of August 3, 2021. According

to shift logs, he performed checks on Ms. Johnson's cell at 06:33 and 06:57 AM, before discovering Baby Boy Johnson's birth during his check at 7:09 AM.

b. Defendant Lieutenant Christopher Candler was on shift the night of August 2, 2021 into the early morning of August 3, 2021. Defendant Lieutenant Candler compiled all of the testimony to include in incident reports surrounding Baby Boy Johnson's birth.

c. Defendant Corporal Maria Reid was on shift in the Administrative Segregation Control Booth when Baby Boy Johnson's birth was discovered, and the Code Blue was called early in the morning on August 3, 2021.

d. Defendant Officer Tony Coles was an Administrative Segregation Officer on shift the night of August 2, 2021 into August 3, 2021. According to shift logs, Defendant Officer Coles performed a shift count on Ms. Johnson's cell at 5:57 AM and reported seeing nothing unusual.

e. Defendant Officer James Robinson was on shift the night of August 2, 2021 into the early morning of August 3, 2021, and responded to the Code Blue, where he stood security during Ms. Johnson's removal to another cell.

f. Defendant Officer Corporal David Dallek was on shift the night of August 2, 2021 into the early morning of August 3, 2021, and responded to the Code Blue. Defendant Officer Dallek removed Ms. Johnson from her cell and Baby Boy Johnson and relocated her to a new cell after the Code Blue.

g. Defendants Officers Marina Odonkor and Teresa Padgett were Administrative Segregation Officers on shift the night of August 2, 2021 into the early morning August 3, 2021.

h. Defendant Officer Jackson was on shift the night of August 2, 2021 into the early morning of August 3, 2021. According to security logs, Defendant Officer Jackson performed checks on Ms. Johnson's cell at 02:39, 04:04, 04:36, 05:18 (at which point he allegedly served Ms. Johnson breakfast), and 05:31.

i. Defendant Officer O'Connor was on shift the night of August 2, 2021 into the early morning of August 3, 2021. According to security logs, Defendant Officer O'Connor performed checks on Ms. Johnson's cell at 03:09 and 03:28.

j. Defendant Officer Adekoye was on shift the night of August 2, 2021 into the early morning of August 3, 2021 in the Administrative Segregation Unit where Ms. Johnson was held.

k. Defendant Officer Terrence Shell was an employee, officer, or deputy of the Rappahannock Regional Jail between May 19, 2021 and August 3, 2021. During the relevant period, Defendant Officer Shell was often responsible for performing checks on Ms. Jonhson's cell. Defendant Officer Shell was employed by the Jail and acting under the color of state law at all times relevant to the events in this Complaint and was responsible for the health, safety, security, welfare and humane treatment of all inmates at the Jail, including Ms. Johnson and her infant child. Defendant Officer Shell is sued in his individual capacity.

l. Upon information and belief, Defendant Doe Officers 1-10 were employees, officers, or deputies of RRJ and were on duty in the Administrative Segregation Unit where Ms. Johnson was housed between August 2, 2021 and August 3, 2021.

16. Defendants RRJ Sergeant Connolly, RRJ Sergeant Brown, First Sergeant Christopher Epling, and RRJ Sergeant Teye (collectively, "Hearing Officers") were employees,

officers, or deputies of the Rappahannock Regional Jail between May 19, 2021 and August 3, 2021 and were responsible for making determinations evaluating incident reports involving Ms. Johnson. Defendant Hearing Officers were employed by the Jail and acting under the color of state law at all times relevant to the events in this complaint, and were responsible for the health, safety, security, welfare and humane treatment of all inmates at the Jail, including Ms. Johnson and her infant child. Defendant Hearing Officers are sued in their individual capacities.

a. Defendant RRJ Sergeant Connolly was a correctional officer employed by the Rappahannock Regional Jail and on duty on June 3, 2021 who presided as Hearing Officer over an institutional hearing against Ms. Johnson for the offense code of I-22 (failure to obey orders of Jail staff).

b. Defendant RRJ Sergeant Brown was a correctional officer employed by the Rappahannock Regional Jail and on duty on June 21, 2021 who presided as Hearing Officer over an institutional hearing against Ms. Johnson for the offense code of I-22 (failure to obey orders of Jail staff). Defendant First Sergeant Christopher Epling was Acting Watch Commander employed by Rappahannock Regional Jail and on duty on June 29, 2021. After an incident where Ms. Johnson was reported to have thrown a juice cup at Officer Rush, Defendant First Sergeant Epling placed her on "2 officer full restraint".

c. Defendant RRJ Sergeant Teye was a correctional officer employed by the Rappahannock Regional Jail and on duty on July 7, 2021 who presided as Hearing Officer over an institutional hearing on Ms. Johnson for the offense code of I-05 (Assault or attempted assault on staff).

17. Defendant Rappahannock Creative Health Care ("RCHC") is a general partnership under contract with the RRJA to provide medical care to the inmates and detainees being held at the Jail on all dates discussed *infra*. The contract also required RCHC to develop all necessary policies and procedures to ensure that the medical care provided at the Jail complied with the requirements of federal and state law. At all times relevant, RCHC primarily operated out of and maintained its principal place of business in Fredericksburg, Virginia.

18. Defendant Peter C. Ober is and was the managing partner of RCHC and the signatory of the contract under which RCHC was obligated to perform constitutionally adequate medical care to the detainees being housed at RRJ. Defenant Ober also worked as a Physician's Assistant (PA) at RRJ and was, at all times relevant employed by RRJA and/or RCHC to, among other things, provide medical care to the inmates and detainees being held at the Jail, including Ms. Johnson. At all relevant times, Defendant Ober was acting within the course and scope of their employment with RRJA and/or RCHC and under color of state law. Defendant Ober is being sued in his individual capacity.

19. Nurse Barbara Meade was a Health Services Administrator employed at RRJ between May 19, 2021 and August 3, 2021 who was involved in Ms. Johnson's treatment throughout the relevant period. As Health Services Administrator, Defendant Meade was responsible for providing daily nursing care and treatment to inmates, as well as ensuring that all care provided to inmates is according to applicable local, State, Federal, and DOC standards. Defendant Meade is sued in her individual capacity.

20. Upon information and belief, Defendants Amanda Fisher, MHNP, Laura Hedden, RN, and Helena Sangoe, LPN, Edward Adusei, RN, and Medical Doe Defendants 1-10 (collectively, the "Medical Defendants"), were, at all times relevant employed by RRJA and/or

RCHC to, among other things, provide medical care to the inmates and detainees being held at the Jail. At all relevant times, the Medical Defendants were acting within the course and scope of their employment with RRJA and/or RCHC and under color of state law. The Medical Defendants are sued in their individual capacities.

a. Defendant Amanda Fisher was a Psychiatric Mental Health Nurse Practitioner (MHNP) employed at RRJ between May 19, 2021 and August 3, 2021 who was involved in Ms. Johnson's treatment throughout the relevant period. Defendant Fisher was also involved in Ms. Johnson's treatment when she was incarcerated at RRJ in 2020 and in the recommendation to screen Ms. Johnson for inpatient hospitalization due to her ongoing mental health challenges.

b. Defendant Laura Hedden was a Registered Nurse (RN) employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment throughout the relevant period.

c. Defendant Helena Sangoe was a Licensed Practical Nurse (LPN) employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment throughout the relevant period.

d. Defendant Nurse Edward Adusei was a LPN employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment during the relevant period. Defendant Adusei was also involved in Ms. Johnson's treatment when she was incarcerated at RRJ in 2020 when Ms. Johnson was transferred for inpatient hospitalization due to her ongoing mental health challenges. Defendant Adusei was the medical staff member who made notes about the results of Ms. Johnson's disciplinary hearings on June 15, 2021, June 19, 2021, and July 13, 2021.

e. Upon information and belief, Medical Doe Defendants 1-10 were employed by RRJA and/or RCHC between May 19, 2021 and August 3, 2021, and had a duty to provide medical care to Ms. Johnson during her incarceration.

21. Defendants Medical Officers Coleman and Payne (together, "Medical Officers") were, employed by RRJA and/or RCHC between May 19, 2021 and August 3, 2021 to, among other things, provide medical care to the inmates and detainees being held at the Jail. At all relevant times, the Medical Officers were acting within the course and scope of their employment with RRJA and/or RCHC and under color of state law. Throughout the relevant period, the Medical Officers would visit and interact with Ms. Johnson while she was housed in the Administrative Segregation Unit. The Medical Officers are sued in their individual capacities.

22. At all times material hereto, all Defendants were acting under the color of state law; pursuant to their authority as officials, agents, contractors or employees of Rappahannock Regional Jail; within the scope of their employment as representatives of public entities and were deliberately indifferent to the Constitutional and Statutory rights of Ms. Johnson and her infant child.

## IV. FACTUAL ALLEGATIONS[1]

**<u>Ms. Johnson's Condition</u>**

23. Ms. Johnson had previously been diagnosed with Schizoaffective Disorder, sometimes also described as Schizophrenia, prior to her incarceration at RRJ.

24. When unmedicated, Ms. Johnson presents as disorganized in thinking and speech and detached from reality, experiences auditory or visual hallucinations, and has difficulty discerning what sights, sounds, and experiences are real and what she is imagining.

[1] Unless otherwise indicated, the factual allegations are made upon reasonable knowledge, information, and belief.

25. Without the assistance of medication, Ms. Johnson's Schizophrenia impacts all aspects of her major life activities. Her hallucinations and inability to discern them from reality make it difficult for her to maintain employment, advocate for herself in medical settings, and participate meaningfully in her own defense.

26. Since departing RRJ, Ms. Johnson spent significant time at Western State Hospital and now resides in a residential treatment program for individuals with mental health conditions. She receives consistent medication and her mental health issues are well-managed. She has secured employment.

**RCHC's Contract with RRJA**

27. On May 22, 2019, RCHC entered into a contract with RRJA to provide medical care to the detainees being housed at the Jail. That contract contemplated that RCHC would provide such care for a two-year period of time, beginning on July 1, 2019 and ending on June 30, 2021.

28. The contract included the option for three additional renewals of that contract, each for a period of one year.

29. RRJ's publicly accessible information still lists the contract with RCHC as the controlling contract for inmate medical services, physical exams for new hires, and inmate dental services.

30. In the original contract, RCHC expressly assumed a number of duties with respect to the provision of medical care to the Jail's detainees. Indeed, in defining the scope of the medical services to be performed by RCHC, the contract states:

> We will accept supervisory responsibility for all medical staff in performance of their duties in accordance with the standard

> operation procedures of [the Jail]and the Medical Department's treatment guidelines.

31. Moreover, the contract describes in detail the duties that RCHC and its agents were to perform with respect to the Medical Clinic at the Jail. These duties included (but are not limited to), the following:

a. Review of all daily sick call logs and nurse's notes for appropriateness of care;
b. Assisting with the development of a sick call program, to include the development of nursing protocols that ensure that patients in need of follow-up care are referred to an RCHC provider as medically necessary;
c. The supervision of the Jail's staff, to include ensuring that the Jail's staff rendered medical care in compliance with written protocols;
d. Assisting Jail staff with responses to inmate grievances and complaints as they relate to the provision of medical care; and
e. Other such duties as will be developed in discovery.

**<u>RRJ's Policies and Procedures for Inmate Requests</u>**

32. All cells at Rappahannock are equipped with an intercom system which allows for two-way communications between Central Control and inmates.

33. After the evening lockdown, the intercom in each cell acts as an emergency call button to alert staff should an inmate become ill.

34. If an emergency call button is activated, Central Control is required to dispatch staff to investigate the situation.

35. Inmates at Rappahannock regularly use the intercom button to converse with jail officials as well as to request emergency assistance.

36. Ms. Johnson used the intercom system on multiple occasions to inform Rappahannock staff, including Officer Does 1-10 and Medical Does 1-10, that she was physically unwell, that she had basic hygiene needs that were not being met, and that she needed additional assistance from medical professionals.

37. On multiple occasions Ms. Johnson made requests to see a nurse in three different ways: (1) through the intercom button, (2) by asking officers patrolling her unit, and (3) through grievance forms.

38. Ms. Johnson shared with the Officer Defendants and Medical Defendants through the intercom, in person, and in written requests, that she was pregnant and feeling unwell.

39. Ms. Johnson’s requests were often ignored or denied by Officer Defendants and Medical Defendants.

40. Ms. Johnson did not have regular access to showers, clean clothes, and linens for the duration of her incarceration at RRJ, despite numerous requests made over the intercom system to Officer Defendants and Medical Defendants and to Officer Defendants patrolling her unit.

41. The intercom button in Ms. Johnson’s cell was operating properly throughout her detention as she was able to reach jail officials through the use of the intercom system.

30. Inmates at Rappahannock can also request assistance and medical treatment by filling out forms and submitting the forms for consideration by jail officials.

31. Officers at Rappahannock are meant to give medical request forms to medical staff.

32. Upon receiving the form, officials are supposed to give the requesting inmate a pink carbon copy of the form to indicate that the request had been submitted.

33. Ms. Johnson’s made numerous requests for medical attention between her arrival on May 19, 2021 and the incident on August 3, 2021. These requests were made orally, through

speaking informally to officials or utilizing her cell's intercom button, or in writing, through attempting to fill out request forms.

34. The majority of Ms. Johnson's requests to the Officer Defendants were ignored or not responded to, and she believes that many were not recorded at all.

35. Officer Defendants also repeatedly denied Ms. Johnson the forms needed to make requests for medical care and to document grievances.

37. In particular, Defendants Medical Officer Coleman and Officer Terrence Shell, refused to provide Ms. Johnson with request forms on several occasions and instead responded to her request for a form by verbally humiliating her.

**Ms. Johnson's Arrival at Rappahannock**

42. On May 19, 2021, Ms. Johnson was booked at the Rappahannock Regional Jail, and housed in cell SP6-15.

43. Ms. Johnson had previously been a pretrial detainee at Rappahannock Regional Jail on multiple occasions. Most recently, Ms. Johnson had been detained at RRJ from November 1, 2019 to February 6, 2020, and then from August 3, 2020 until October 16, 2020.

44. During her detention at RRJ from November 1, 2019 to February 6, 2020, Ms. Johnson experienced significant mental health symptoms. During that time, Ms. Johnson showed a pattern of refusing to leave her cell for hearings, exhibiting signs of delusions and disorganized speech and thinking, failing to engage in self-care, and refusing to take her medication. Ms. Johnson also expressed suicidal ideation and was placed on a full suicide watch. Due to the severity of her condition, she was transferred to Western State Hospital for care. Medical staff involved in

her care during this detention included Portia Bennet, Christian Holdbrook, Lyudmyia Miller and Edward Adusei.

45. The classification counselor, Maria Reid, who completed Ms. Johnson's Classification Interview on May 20, 2021 noted that she had been transferred to Western State Hospital during her February 2020 hospitalization. Western State Hospital is a mental health facility run by the Virginia Department of Behavioral Health and Developmental Services. Upon her return to RRJ on August 3, 2020, her intake screening noted that she had "just got out of western state" and that she was "schizoaffective."

46. In her May 20, 2021 Classification Interview, under "Special Management Issues," the counselor marked the box for "psychological impairment," "suicide risk," and "medical problem." The Classification Interview also acknowledged that Ms. Johnson needed assessment for "limited physical capacity, acute illness," and that for emotional stability she had "moderate impairment, requires monitoring." Further, she was recommended for both Mental Health Services and Medical Services.

47. Further, on her the RRJ Intake Classification Relocation Notice, issued on May 19, 2021, the Relocating Supervisor Corporal Gonier noted that Ms. Johnson had numerous alerts for mental health issues.

48. The Medical Staff noted on her chart on May 19, 2021 that Ms. Johnson had been transferred from Prince George's County Jail without her medication, and that she had a history of schizophrenia and bipolar. The transfer documents from Prince George's County Jail reflected that Ms. Johnson was prescribed Olanzapine.

49. Upon information and belief, despite this documentation and her clear presentation as an individual with a disability, Defendant Taylor did not appear to assess Ms. Johnson for disability accommodations or provide her with disability accommodations.

**Rappahannock Regional Jail's Deliberate Indifference to Ms. Johnson's Mental Health and Pregnancy**

50. Ms. Johnson was approximately four months pregnant when she was first admitted to RRJ.

51. From the very beginning of her detention at RRJ, Ms. Johnson was also showing obvious signs of psychosis, and it was clear that she was experiencing a mental health crisis. Both the Officer Defendants and Medical Defendants were aware of Ms. Johnson's escalating mental health symptoms.

52. Despite these alarming symptoms the Medical Defendants did not take appropriate actions to treat Ms. Johnson, or transfer her to a location that was equipped to treat her. Instead, the Officer Defendants and Medical Defendants engaged in a cycle of punishing and isolating Ms. Johnson, while allowing her mental and physical health, and that of her unborn baby, to dangerously deteriorate.

53. Medical Defendants knew that Ms. Johnson was prescribed medication to treat her schizoaffective disorder, but there is no indication that she was provided that medication or others after her arrival.

54. Contrary to RRJ policy,[2] when Ms. Johnson was diagnosed as pregnant, Jail officials and medical staff did not provide the information necessary for Ms. Johnson to make

[2] RJ Policy No. 3.7.5 regarding Inmate Pregnancy provides that when Medical Staff confirm that an inmate is pregnant, Medical staff should notify the Inmate Services Manager and the inmate's Case Manager of the pregnancy. The Case Manager contacts the inmate to ascertain what arrangements will be made for her child if it is born while she is

decisions on behalf of herself and her baby, prepare for labor, or prepare for her baby's care after her incarceration.

55. On information and belief, on or about June 2, 2021, Ms. Johnson missed a court appearance due to mental health symptoms, including disorganized thinking and delusions. After initial attempts to get her to attend, Officer David Theisen left Ms. Johnson in her cell and reported her noncompliance. As a result of Ms. Johnson's failure to attend her court, appearance she was disciplined and continued to be housed in Administrative Segregation.

56. On June 3, 2021, Ms. Johnson was supposed to relocate to a different cell. When Officer Barlow tried to move her, she refused to leave her cell, and was charged by Officer Barlow for failing to obey orders. Officer Barlow noted in his report that "Ms. Johnson is an ADA inmate and has behavioral issues." He also emailed Mental Health about the situation.

57. On June 7, 2021 Ms. Johnson was sentenced to three days of isolation as punishment for refusing to leave her cell. However, Hearing Officer Sergeant Connolly reported that Ms. Johnson was not present at the disciplinary hearing, and when she was read the charges by Sergeant Connolly through her cell door, she was unable to respond or actively participate in the hearing.

58. On June 9, 2021 she was reported as allegedly refusing a sick call by Defendant Nurse Christian Holdbrook. No additional actions were taken by medical to follow up.

59. On June 15, 2021, Ms. Johnson was cleared to be placed in the general population. However, on June 21, 2021, Ms. Johnson was again sentenced to 3 days of isolation for refusing to comply with Officer Cody Brooks Order to relocate. Once again, she did not appear at the

incarcerated, and assists the inmate in contacting family or friends to make arrangements for the child. If there is no one to accept responsibility for the child, the Case Manager contacts the Department of Social Services in the county where the inmate resides. RRJ policy provides that arrangements must be made with the Department of Social Services for temporary custody of the child.

hearing and was unable to answer the questions on the charge sheet or even sign the charge sheet, but was nevertheless found guilty by Hearing Officer Sergeant Brown.

60. RRJ knew that Ms. Johnson was pregnant on June 20, 2021, at the latest, because on that date, Ms. Johnson filled out an inmate request form stating that she needed a pregnancy test, and that pregnancy test was returned positive.

61. On June 21, 2021 Defendant Peter Ober, PA, prescribed her prenatal tablets to take daily. However, Defendant Ober never examined Ms. Johnson.

62. On June 24, 2021 Ms. Johnson placed a medical request asking to see medical staff as soon as possible about pregnancy inquiries. This request was marked as received on June 24, 2021, but Ms. Johnson was not seen by any medical staff.

63. On June 25, 2021, Nurse Defendant Helena Sangoe, LPN, wrote a note for Defendant Amanda Fisher, MHNP, in Ms. Johnson's chart, describing the meeting with Ms. Johnson on June 11, 2021. Nurse Sangoe noted that Ms. Johnson's prescription for Olanzapine terminated June 17, 2021. Sangoe specifically noted that due to the severity of the mental illness it was "a risk to the health of the pregnancy to be untreated." Sangoe noted that Ms. Johnson should be placed on a list to be seen by Mental Health ASAP. Sangoe further requested that medical staff consider administering medication through injection for Ms. Johnson.

64. Ms. Johnson was not seen by a Mental Health professional as a result of this report.

65. On June 29, 2021, there was an incident in which Ms. Johnson was reported as having thrown a juice cup at Officer Rush. As a consequence, Ms. Johnson was charged with an officer assault, Defendant First Sergeant Epling placed her on "2 officer full restraint", and the incident was reported to Mental Health.

66. On July 2, 2021, Ms. Johnson again missed a court appearance due to her mental health. Office Kristie Davis and Office Brandon Lake tried to bring her to Court, but reported that Ms. Johnson refused to go because she did not believe that she had a court appearance. Ms. Johnson told the officers that she believed she had spoken to her mother and her lawyer and they had told her she did not have court.

67. On July 2, 2021, Ms. Johnson was scheduled for a disciplinary hearing on her charge of officer assault. The hearing was postponed by Defendant Sergeant Teye due to Ms. Johnson "having a mental health alert." Sergeant Teye reported that he'd asked Mental Health for advice on whether she was okay to appear before a hearing officer.

68. On July 7, 2021, Defendant Sergeant Teye proceeded with the disciplinary hearing, despite his concern about Ms. Johnson's competency in light of her mental health. Sergeant Teye read Ms. Johnson the charges against her and asked her how she wanted to plead. He reported that in response, Ms. Johnson started talking about things that were not there. Ms. Johnson's mental health symptoms prevented her from understanding or participating in the disciplinary hearing. Defendant Sergeant Teye therefore ended the hearing and simply found her guilty based on the officer's report. When asked if she wanted to appeal, she was unable to answer the question. Defendant Sergeant Teye stated that he emailed Mental Health about this incident. Ms. Johnson continued to be held in administrative segregation.

69. On July 9, 2021, Defendant Laura Hedden, RN, left another note for Defendant Amanda Fisher, MHNP, stating that Ms. Johnson had not been taking her medication. Hedden reported that Ms. Johnson was "uncooperative, disheveled, mute. Paranoid. Insight and judgment limited." Hedden again requested Fisher consider providing medication by injection for Ms. Johnson, and again noted that "[d]ue to the severity of mental illness it is more of a risk for her to

go untreated during pregnancy." Hedden noted that she planned to follow up "in a couple of weeks."

70. On July 13, 2021, Ms. Johnson filled out an inmate request form, asking to speak with a social worker. Her form was returned, stating that RRJ did not have a social worker to assist her, and that she needed to state what she wanted to speak with the social worker about so they could direct her request. No action was taken.

71. That same day, July 13, 2021, Officer Wagner reported that Ms. Johnson was failing to get up and get dressed and was not showering. She was cited with refusing to obey an order.

72. On July 13, 2021 Nurse Edward Adusei made a note in Ms. Johnson's chart that she had refused an Institutional Classification Committee hearing. No other action was taken.

73. On July 15, 2021, Defendant Amanda Fisher, MHNP entered a treatment plan for Ms. Johnson to receive the Abilify Injectible. However, Ms. Johnson does not appear to have been administered this medication.

74. On July 19, 2021, Ms. Johnson had been scheduled for an OBGYN appointment and prenatal checkup. Ms. Johnson was not aware of where she was going, and expressed that she was not comfortable attending. She was therefore not taken to her prenatal appointment.

75. Later that day, Defendant Nurse Laura Hedden and three unnamed staff members reported speaking with Ms. Johnson about the missed appointment and medication. However, Nurse Hedden reported that Ms. Johnson was speaking rapidly, and the content of her speech was grandiose—hallmark symptoms of psychosis.

76. Despite the fact that both the correctional officers and mental health staff had notice that Ms. Johnson was experiencing symptoms of psychosis, including delusions, disorganized

thoughts and speaking, and breaks with reality, there was no evaluation of whether or not Ms. Johnson fully understood the question asked to her, or whether she understood the nature of the medical appointment, or whether her competency should be evaluated. Nor did the medical staff take any action to transfer Ms. Johnson to a location better equipped to provide her care, like Western State Hospital.

77. Instead, medical staff presented Ms. Johnson with a medical refusal form and told her to sign it.

78. On numerous occasions following that appointment, Ms. Johnson made requests to officers and over the intercom to see a nurse so that she could get the ultrasound.

79. Ms. Johnson's requests were ignored or denied.

80. Ms. Johnson never received an ultrasound, or any examination by a qualified obstetrician, or even by a licensed doctor. As a result, the health and gestational age of her fetus was never evaluated by any medical professional.

81. On July 21, 2021, James Mackie, LCSW, CSAC spoke with Ms. Johnson about returning to the General Population. Ms. Johnson was exhibiting clear signs of psychosis during this interview. Mackie reported that Ms. Johnson was presenting with tangential thinking, loose associations, hypomania, and pressured speech. Ms. Johnson was unable to focus on the conversation about her missed medical appointment and was claiming that she had documentation that she did not need to take any medication by injection.

82. After this visit, Mackie noted in Ms. Johnson's chart that she should be seen by the Mental Health staff weekly.

83. However, Ms. Johnson did not receive any additional mental health visits or evaluations for the remainder of her time at RRJ.

84. On July 22, 2021, Corporal Katelyn Koscienski ordered Ms. Johnson to relocate to a different cell. Ms. Johnson refused and said she was not comfortable going to a pod. Corporal Koscienski reported that Ms. Johnson continued talking but she could not understand what Ms. Johnson was trying to tell her. She informed Sergeant Teye of the incident, and an email was sent to Mental Health about Ms. Johnson.

85. On July 22, 2021, Ms. Johnson was ordered to remain in administrative segregation for failure to obey the order from Corporal Koscienski.

86. On July 27, 2021, a Mental Health Directive was issued, by Portia Bennet, requiring Mental Health Observation of Ms. Johnson on thirty-minute intervals.

87. Oftentimes when Officers would perform these checks on Ms. Johnson's cell, they would simply open and close the window on her cell door as they passed, but never look into her cell, engage with her, or respond to her requests.

88. However, the Correctional Officers regularly failed to check on Ms. Johnson.

89. Ms. Johnson was kept in isolation and was not allowed to leave her cell, even to shower.

90. The cell where Ms. Johnson was detained was filthy. Ms. Johnson had only a thin mattress and blanket on the floor, and had to eat her meals on the floor next to the toilet. Papers and trash were scattered over the floor. See Exhibit 1 (Photo of cell).

91. Ms. Johnson had scrawled messages all over the walls and the tray slot of her cell. See Exhibit 2 (Photo of Writing on Wall).

92. On July 29, 2021, Ms. Johnson submitted a medical request form asking to see Medical. Her request form was marked as received on August 1, 2021, but Ms. Johnson was never seen by medical staff.

93. During her detention at the Jail, no one at RRJ ever contacted Ms. Johnson's prior medical providers at either Prince George's County Jail or Western State Hospital about her condition. No outside providers were ever brought to see her. No action was taken to do anything about her escalating symptoms, or to consider a transfer to a facility better equipped to meet her medical needs. RRJ never contacted her public defender to alert her to Ms. Johnson's deteriorating condition, so that a competency evaluation could be conducted. RRJ itself never conducted any competency evaluation of Ms. Johnson.

**RRJ's Deliberate Indifference to Ms. Johnson's Emergency Medical Needs Causing her Give Birth Alone in her Cell**

94. By August 2, 2021, Ms. Johnson was roughly 27 weeks pregnant.

95. Ms. Johnson's water broke late in the afternoon on August 2, 2021, prior to dinner service.

96. Ms. Johnson informed Officer Defendants and Medical Defendants, both through the intercom and directly, that her clothes were wet and that her bedding was soaked. She also showed officers the soaked clothes and bedding.

97. Officer Defendants and Medical Defendants ignored Ms. Johnson's requests.

98. On the night of August 2 and into the early morning of August 3, 2021, Defendants Officer Adekoye, Medical Officer Coleman, Officer Terrence Shell, Medical Officer Payne, Officer Teresa Padgett, Corporal Paul Wallace, Lieutenant Christopher Candler, Corporal Maria Reid, Officer Tony Coles, Officer James Robinson, Officer Marina Odonkor, Officer Jackson and Officer O'Connor, were on duty.

99. According to shift logs, Defendant Officer Jackson performed checks on Ms. Johnson's cell at 18:08, 18:35, 19:06, 19:34, 19:59, 20:42, 21:04, 21:42, 22:09 (at which time he allegedly provided her a pregnancy snack bag), 22:41, 23:12, 23:47, 00:13, 00:42, and 01:41.

100. According to shift logs, Defendant Officer O'Connor performed a check on Ms. Johnson's cell at 01:15.

101. In the early morning hours of August 3rd, around 2:00 AM, Ms. Johnson began experiencing severe pain and went into active labor.

102. During labor, Ms. Johnson repeatedly screamed for help, but received no attention or response.

103. Ms. Johnson was terrified for herself and for her infant child.

104. Ms. Johnson delivered her child by herself alone in her cell.

105. Upon delivery, Ms. Johnson's newborn child was alive and moving and looked up at Ms. Johnson. Ms. Johnson repeatedly called for help over the intercom system and through her cell door after the birth of her son.

106. Based on Ms. Johnson's previous experience using the intercom, nothing about the intercom button gave the impression that it was not working.

107. No Rappahannock medical or correctional staff responded to Ms. Johnson's pleas for aid.

108. According to shift logs, Defendant Officer Jackson performed checks on Ms. Johnson's cell at 02:39, 04:04, 04:36, 05:18 (at which point he allegedly served Ms. Johnson breakfast), and 05:31.

109. According to shift logs, Defendant Officer O'Connor performed checks on Ms. Johnson's cell at 03:09 and 03:28.

110. According to shift logs, Defendant Officer Tony Coles performed a check on Ms. Johnson's cell at 05:57.

111. According to shift logs, Defendant Corporal Paul Wallace performed checks on Ms. Johnson's cell at 06:33 and 06:57.

112. Yet Ms. Johnson remained alone in her cell, with her premature newborn child, for at least five hours without any medical assistance.

113. Ms. Johnson continued to request emergency medical attention throughout the night.

114. Despite her pleas for help, she received no response. At some point, she stopped pressing the button because she had lost hope and believed that no one was coming to help her.

115. According to shift logs, Defendant Corporal Paul Wallace performed a check on Ms. Johnson's cell at 07:09 am on the morning of August 3, 2021. Defendant Corporal Paul Wallace reportedly found Ms. Johnson and her newborn. He then called a "Code Blue," alerting Rappahannock staff to a medical emergency.

116. Ms. Johnson believed that her infant child was still alive at this time.

117. Medical staff responding to the call noted Ms. Johnson was dressed only in a bra and underwear.

118. Defendant Corporal Wallace saw blood all over Ms. Johnson's blanket and bedding, and Nurse Defendant Helena Sangoe reported that there was blood all over the floor.

119. Defendant Officers James Robinson and David Dallek responded to the Code Blue and stood security while waiting for medical staff to arrive.

120. Defendant Lieutenant Christopher Candler arrived shortly thereafter and also called for medical assistance.

121. Defendant Corporal Maria Reid and Defendant Officer Marina Odonkor were in the Administrative Segregation Control Booth when the Code Blue was called.

122. Defendant Corporal Reid responded to the Code Blue and came to the cell.

123. Medical Staff, including Nurse Defendants Barbara Meade and Helena Sangoe, and Nurse Sampson Otoo then arrived at the cell and attempted to render medical aid to Baby Boy Johnson. The nurses attempted CPR on the infant but were unsuccessful.

124. Defendant Corporal Reid and Nurse Austin Stoy, RN then forcibly separated Ms. Johnson from her child. Defendant Corporals Reid and Dallek handcuffed Ms. Johnson and locked her in a different cell.

125. Ms. Johnson never saw her infant child again.

126. Ms. Johnson was not given any medical assistance by the RRJ Medical Staff.

127. Due to the deliberate indifference of all Defendants to Ms. Johnson's mental health needs since her arrival at the Jail and the trauma of delivering a baby alone in her cell, Ms. Johnson suffered an acute mental health crisis.

128. Defendant Corporal Reid reported that Ms. Johnson talked to someone about the baby on a nonexistent phone and Defendant Lieutenant Candler reported that Ms. Johnson seemed to be in an altered mental state when he arrived.

129. A staff member called 911 and a Rescue Squad was sent to the Jail, arriving around 7:30 a.m.

130. Ms. Johnson and her infant child were then separately transported from RRJ in rescue vehicles to Mary Washington Hospital, also called Stafford Hospital.

131. The doctors at Stafford Hospital officially pronounced Baby Boy Johnson deceased.

132. Ms. Johnson was treated at Stafford Hospital. Dr. Rachel McCarter noted that Ms. Johnson was undergoing an active psychotic break when she was brought to the hospital. Ms. Johnson was restrained and forcibly administered the antipsychotic medication Haldol. Ms. Johnson was also treated for vaginal bleeding and prescribed Pitocin to assist in postpartum recovery. She also had anemia from childbirth.

**Autopsy**

133. Baby Boy Johnson's body was sent to the Office of the Chief Medical Examiner for the Commonwealth of Virginia for an autopsy.

134. The autopsy revealed a well-developed male child, approximately 27 weeks of age.

135. There was no evidence of prolonged intrauterine fetal death.

136. The autopsy revealed evidence that the infant was born alive, including a gastric air bubble, although the findings were discordant.

137. The cause of death was determined to be due to a significant placenta/umbilical cord infection, known as "acute chorioamnionitis and funisitis," which can result in premature delivery and death.

138. The National Institute of Health describes the condition as follows:[3]

a. Chorioamnionitis is a common infection of pregnancy, typically occurring in the setting of prolonged membrane rupture or labor. It may be diagnosed clinically based on signs such as maternal fever, microbiologically based on amniotic fluid culture obtained by amniocentesis, or by histopathologic examination of the

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3008318/#:~:text=Definition,the%20setting%20of%20membrane%20rupture.

placenta and umbilical cord. Chorioamnionitis is associated with postpartum maternal infections and potentially devastating fetal complications including premature birth, neonatal sepsis and cerebral palsy.

b. The main preventative strategy is administration of antibiotics to women with preterm premature rupture of membranes which reduces the incidence of clinical chorioamnionitis, prolongs the time to delivery and improves neonatal outcomes.

c. Chorioamnionitis can be diagnosed due to maternal fever and maternal and fetal tachycardia.

d. Evidence from randomized trials and observational studies demonstrate that immediate intrapartum use of broad-spectrum antibiotics significantly reduces maternal and fetal complications of chorioamnionitis. The frequency of neonatal sepsis is reduced by up to 80% with intrapartum antibiotic treatment. The standard regimen effectively treats maternal infection (>95% success rate).

### A. Ms. Johnson is Sent to Western State Hospital

139. Ms. Johnson was then taken to Western State Hospital, a mental health hospital in Staunton, Virginia. Western State Hospital is part of the Virginia Department of Behavioral Health and Development Services.

140. None of Ms. Johnson's belongings from her cell, including grievance forms, were ever returned to her.

141. Ms. Johnson remained at Western State Hospital for over four months.

142. During her time at Western State Hospital, Ms. Johnson was given antipsychotic medication.

143. The medical team at Western State noted that Ms. Johnson's psychosis was exacerbated by her traumatic experience giving birth alone and the death of her infant child. The medical team at Western State Hospital reported that Ms. Johnson was deeply grieving over the death of her infant child, and was consistently meeting with her chaplain and her medical team to assist her in that grieving process.

144. Ms. Johnson wanted to name her child Tozart N. Estes, but the deceased infant child was never issued a birth certificate and she was never allowed to officially name him. Ms. Johnson was never given the opportunity to have a funeral for her child.

145. At no point during her stay at Western State Hospital did Ms. Johnson have access to RRJ's grievance procedure.

146. After several months at Western State Hospital, Ms. Johnson underwent a competency test to be deemed fit to stand trial.

147. Ms. Johnson passed her competency test and was sent to Prince William – Manassas Regional Adult Detention Center until October 21, 2021.

148. As of the date of this filing, Ms. Johnson is no longer incarcerated and is instead in a residential treatment program for her mental health.

**RRJA's Pattern of Deliberate Indifference**

149. Rappahannock Regional Jail Authority has a pattern and practice of denying or delaying the provision of medical care to inmates, particularly the provision of mental health care.

150. RRJA has a pattern and practice of putting inmates in isolation or administrative segregation rather than addressing their medical needs.

151. RRJA has a pattern of allowing nurse practitioners to exceed the scope of their duties, and failing to provide inmates access to physicians or other licensed professionals.

152. In recent litigation in this district, inmates at Rappahannock Regional Jail have alleged the following:

a. RRJ ignored multiple medical request forms from inmates reporting severe headaches who subsequently had a stroke and died. The inmate alleged that the nurses were exceeding the scope of their practice/licensure by making final medical decisions to deny care, rather than scheduling follow up appointments with a physician.[4]

b. An inmate made medical staff at RRJ aware of mental health issues including severe depression, PTSD, and past suicide attempts but the Medical Staff failed to provide access to mental health professional for months at a time, and failed to answer medical request forms for up to three months.[5]

c. An inmate was not provided his prescribed medication for anxiety and PTSD between February and July, and his medical request forms went three months without a response.[6]

d. An inmate was prescribed psychiatric medications prior to detainment, and was detained for over a month without receiving his medication. Further, inmates medical request forms were completely denied.[7]

---

[4] *Shanks v. Rappahannock Regional Jail Authority*, 23-cv-00039
[5] *Kimbrough v. Kevin Hudson*, 22-cv-0060
[6] *Bartlett v. Rappahannock Regional Jail*, 21-cv-862
[7] *Weyant v. Rappahannock Regional Jail*, 21-cv-141

e. An inmate was denied treatment and medical attention for a chronic disease by the Medical Staff at RRJ, in particular Barbara Meade.[8]

f. An inmate hit his head, lost consciousness and was disoriented. The Medical Staff placed him in isolation rather than providing actual medical treatment, and continues to deny inmate medical requests for additional treatment.[9]

g. Inmate with avascular necrosis has been denied injections, pain mediation, x-rays and MRI that he was prescribed before arriving at RRJ. Medical Staff at RRJ continues to deny inmates requests for medications and surgery, and has denied inmates requests for a meeting with a Mental Health Doctor.[10]

h. Inmate was denied a request for a wheelchair or walker from the medical staff after suffering a back and hip injury. Inmate couldn't walk and urinated on himself in his cell, and was then at first denied a shower by correctional officers. RRJ continues to ignore medical request forms filed by the inmate.[11]

i. Inmate has been requesting medication for auto-immune illness, and has been repeatedly denied and mocked by medical staff and RRJ officers.[12]

j. Inmate was prescribed medications at a prior detention facility, but was refused a medical appointment at RRJ when his medications ran out. Inmate requested a doctor's appointment, but was never actually evaluated. Inmate had to wait multiple months to have a subsequent medical appointment and receive treatment.[13]

---

[8] *Vann v. Rappahannock Regional Jail, et al.*, 17-cv-274
[9] *Conway v. Superintendent, Rappahannock Regional Jail*, 19-cv-280
[10] *Wearen v. Rappahannock Regional Jail*, 19-cv-43
[11] *Pettus v. Rappahannock Regional Jail, et a.l*, 18-cv-1201
[12] *Love-Robinson, PhD v. Grimes, et al.*, 16-cv-669
[13] *Rose v. Grimes*, 16-cv-620

k. Inmate was not given his prescribed medications when he arrived at RRJ. The inmate had a doctor's appointment scheduled to which they were never taken. Inmate alleges that multiple medical request forms were turned down and not responded to, and that it took over five months to get medication for mental health issues.[14]

l. Inmate was denied medication described for bipolar disorder and told they needed no medication.[15]

## V. CLAIMS FOR RELIEF

**Claim I: Fourteenth Amendment Violation**

U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983

*Against RRJA, RCHC, Officer Defendants, Hearing Officers, Peter C. Ober, Barbara Meade, Medical Defendants & Medical Officers*

153. Ms. Johnson adopts and incorporates paragraphs 1 through 152 above as if fully set forth herein.

154. Plaintiff is a citizen of the United States and all Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

155. Plaintiff has a clearly established right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from deprivations of her life and liberty without due process of law.

156. Plaintiff had not yet been convicted of the crime with which she had been charged.

[14] *Brown v. Stevenson*, 16-cv-723

[15] *Jones v. Meade, et al.*, 16-cv-164

157. As a pretrial detainee being housed at the Jail, Ms. Johnson had a right under the Fourteenth Amendment to receive constitutionally adequate medical care for her objectively serious medical needs.

158. Ms. Johnson was diagnosed with Schizoaffective Disorder, a sufficiently serious medical need which required ongoing treatment and medication.

159. Ms. Johnson was also diagnosed as pregnant while at RRJ pursuant to the Jail's own administered pregnancy test, making Officer Defendants and Medical Defendants, as well as Defendant Peter Ober, aware of the obvious and necessary intervention of medical services to support her pregnancy. Defendants were subjectively aware of the risk and seriousness of Ms. Johnson's mental health condition, due to their own medical and correctional records, and due to the observations of correctional and medical officers between May and August 2021.

160. Defendants were also subjectively aware of the need to closely monitor Ms. Johnson's physical and mental health, as demonstrated by the medical directives requiring weekly, and then thirty-minute recurring mental health checks.

161. Defendants were aware that Ms. Johnson was pregnant, that she suffered from Schizoaffective Disorder, and that during her prior incarceration at RRJ her symptoms worsened significantly and rapidly enough that they needed to transfer her to a medical correctional facility. Defendants were further aware of her mental health condition, her risk of suicide, and her need for consistent monitoring, all facts which made Defendants aware of the substantial risk of harm both for Ms. Johnson and her unborn child if she was left untreated.

162. Medical Defendants were explicitly aware of this risk, as it was written in Ms. Johnson's medical file that due to the severity of her mental illness it was "a risk to the health of the pregnancy to be untreated."

163. As a direct and proximate cause of Defendants' failure to address Ms. Johnson's serious medical needs, as set forth *supra*, Ms. Johnson was left virtually ignored in her cell, was not medicated appropriately, was not provided with a prenatal examination, and was not transferred to a facility equipped to provide her adequate medical care. This lack of proper treatment allowed Ms. Johnson's mental health condition to worsen, impairing her ability to advocate for herself and her unborn child. Ms. Johnson's untreated mental illness directly impacted her ability to make decisions and act in her own and her unborn child's best interest.

164. Furthermore, when Ms. Johnson went into labor and gave birth, that constituted an objectively serious medical need, which any lay person would have recognized as creating an obvious need for medical intervention on her behalf.

165. Baby Boy Johnson's premature birth constituted an objectively serious medical need on behalf of Baby Boy Johnson.

166. At the time Ms. Johnson went into premature labor, she was subject to the Mental Health Directive issued by Portia Bennet requiring Mental Health Observation on thirty-minute intervals, however she remained alone in her cell and unable to access assistance for the duration of the night.

167. Defendants RRJ Officer Jackson, RRJ Officer O'Connor, Corporal Paul Wallace and Officer Tony Coles all alleged that they complied with the mental health directive and completed security checks on Ms. Johnson's cell during the period of time in which she labored and delivered her infant son, and during the more than five hours she spent in her cell with him, still attached to the umbilical cord.

168. Notwithstanding that knowledge, Defendants exhibited deliberate indifference to Ms. Johnson's objectively serious medical need in failing to provide any medical assistance to her

in the time between her water breaking in the afternoon, her going into labor and giving birth at 2 am, and her and the child being identified at 7 am. Defendant’s delay in providing timely medical care during her premature labor resulted in substantial physical and emotional harm to both Ms. Johnson and Baby Boy Johnson, who was born alive but died in the five hours prior to the provision of any medical attention by RRJ staff.

169. Defendants were aware of the need to provide regular monitoring of Ms. Johnson’s cell, that there was a substantial risk of harm to her if not regularly monitored due to her condition.

170. Ms. Johnson requested the Officers’ assistance, repeatedly screamed for help and utilized the emergency button in her cell, making the Defendants aware of the substantial risk of harm to her, however, Defendants exhibited deliberate indifference in failing even to investigate Ms. Johnson’s cell and secure for her medical attention.

171. Defendants’ failure to respond to Ms. Johnson's requests for aid caused her to endure labor and delivery alone in a cell.

172. Defendants’ refusal to attend to Plaintiff after delivery for over five hours affirmatively placed her and her baby in state-created danger.

173. Officer Defendants’ treatment of Plaintiff caused her and her newborn to remain without medical assistance for hours.

174. Ms. Johnson experienced extreme pain and suffering during delivery and while waiting for assistance in her cell.

175. Ms. Johnson experienced severe emotional trauma due to giving birth alone in her cell, and due to the death of her infant child.

176. The behavior of the Defendants is so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

177. The aforementioned behavior cannot be said to serve any penological interest or to operate neutrally.

178. In overseeing, administering, executing, and enforcing the laws of the state of Virginia and its municipal corporations, Defendants act under the color of state law.

179. By virtue of RCHC's contract with RRJA, RCHC and its employees and agents acted under the color of state law in performing their medical duties at the jail.

180. Defendants have a duty to provide medical care and reasonable safety to people in the state's custody, and to refrain from affirmatively placing people in state-created danger.

181. That the actions and omissions of all Defendants under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, were all performed under the color of state law and were unreasonable and performed knowingly, intentionally, maliciously, and with deliberate indifference to Ms. Johnson and her infant child's safety, well-being and serious medical needs; with wanton intent for Ms. Johnson and Baby Boy Johnson to suffer an unnecessary intentional infliction of pain and suffering by failing to obtain medical treatment, by reason of which Plaintiffs are entitled to compensatory and/or punitive damages.

## Count II: Supervisory Liability

U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983
*Against Defendant Kevin Hudson*

182. Plaintiff adopts and incorporates paragraphs 1 through 181 above as if fully set forth herein.

183. Defendant Kevin Hudson, as Superintendent, had actual or constructive knowledge that RRJ had a policy, practice, or custom of putting inmates with mental health issues in isolation

rather than providing treatment, of only providing inmates access to care from nurse practitioners rather than from licensed physicians or psychiatrists, of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment for inmates, of giving correctional staff discretion to respond to inmate medical requests, of delaying the provision of medical care to inmates; that RRJ employees had a practice of failing to conduct meaningful security/mental health checks; and that correctional officers and medical staffs were not adequately trained in how to identify individuals in their custody in need of immediate medical attention.

184. Defendant Kevin Hudson, as Superintendent, failed to take action to change any of the above policies, practices, or customs, and failed to develop and implement appropriate policies and procedures and to ensure proper instruction, training, supervision, and medical care.

185. Defendant Superintendent Kevin Hudson's failure to address these constitutionally inadequate procedures amounts to deliberate indifference, and tacit authorization of those practices, which were the proximate cause of the injuries suffered by Ms. Johnson and Baby Boy Johnson, and the death of Baby Boy Johnson.

## Count III: Monell Liability

U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983

*Against Defendants Rappahannock Regional Jail Authority and Rappahannock Creative Health Care*

### *A. Failure to Train and Adequately Supervise*

186. Plaintiff adopts and incorporates paragraphs 1 through 185 above as if fully set forth herein.

187. That the Defendants failed to adequately train officers, correctional employees, and RRJ Medical Staff at all times material to this Complaint on how to care for persons in their custody suffering from serious mental health conditions, how to determine when an individual

needs to be transferred to a facility better equipped for their medical and psychiatric care, how to identify individuals in their custody in need of immediate medical attention, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds or mental health checks on special needs inmates, how to evaluate misbehavior and discipline individuals undergoing mental health crises, amongst other failures.

188. That Defendants failure to adequately train and supervise their officers, correctional employees, and RRJ Medical Staff on how to care for persons in their custody suffering from serious mental health conditions, and individuals in their custody in need of immediate medical attention, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds or mental health checks on special needs inmates, demonstrated a deliberate indifference on the part of Defendant RRJA and RCHC as to whether the failure to adequately train and supervise their correctional employees would result in the violation of the Constitutional, Civil, and Statutory Rights of individuals in their custody, such as Ms. Johnson and Baby Boy Johnson.

189. That the above-mentioned failure to adequately train and supervise correctional and medical staff was a direct and proximate cause of the violations of the Constitutional, Civil, and Statutory Rights of Ms. Johnson and Baby Boy Johnson.

190. That the above-mentioned failure to adequately train and supervise correctional and medical staff was a direct and proximate cause of Baby Boy Johnson's death, and the injuries and damages suffered by both Ms. Johnson and Baby Boy Johnson.

***B. Policies, Practices, and customs of denying or delaying the provision of medical care to inmates, particularly the provision of mental health care.***

191. Plaintiff adopts and incorporates paragraphs 1 through 190 above as if fully set forth herein.

192. That Defendants have a policy, practice, and/or custom of denying or delaying the provision of medical care to inmates, particularly the provision of mental health care.

193. That the actions of the Defendants of allowing correctional and medical staff to ignore inmate medical request forms, of allowing correctional and medical staff to delay responding to medical request forms, of allowing inmates suffering severe mental health conditions to remain unmedicated for significant periods of time, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

194. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

195. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson

196. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

### *C. Policies, practices, and customs of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment*

197. Plaintiff adopts and incorporates paragraphs 1 through 196 above as if fully set forth herein.

198. That Defendants have a policy, practice, and/or custom of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment.

199. That the actions of the Defendants of allowing correctional officers the discretion to ignore inmates' written or verbal requests for medical assistance, and allowing correctional officers to determine whether inmates need medical care, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

200. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

201. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson

202. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

***D. Policies, Practices, and customs of allowing nurse practitioners to exceed the scope of their duties, and failing to provide inmates access to physicians or other licensed professionals.***

203. Plaintiff adopts and incorporates paragraphs 1 through 202 above as if fully set forth herein.

204. That Defendants have a policy, practice, and/or custom of only providing inmates access to care from nurse practitioners, rather than from licensed physicians or psychiatrists.

205. That the actions of the Defendants of only providing inmates access to care from nurse practitioners, rather than from licensed physicians or psychiatrists, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

206. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

207. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson

208. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

### *E. Policies, Practices, and customs of putting inmates in isolation or administrative segregation rather than addressing their medical needs.*

209. Plaintiff adopts and incorporates paragraphs 1 through 208 above as if fully set forth herein.

210. That Defendants have a policy, practice, and/or custom of placing inmates exhibiting mental health symptoms in isolation or administrative segregation, rather than taking action to address that individual's medical needs, and of disciplining rather than treating inmates for mental health symptoms.

211. That the actions of the Defendants of placing inmates exhibiting mental health symptoms in isolation or administrative segregation, rather than taking action to address that individual's medical needs, and of disciplining rather than treating inmates for mental health symptoms, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

212. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

213. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson

214. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages

suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

***F. Policies, Practices, and customs of not conducting security rounds/medical checks in a timely or meaningful manner.***

215. Plaintiff adopts and incorporates paragraphs 1 through 214 above as if fully set forth herein.

216. That Defendants have a policy, practice, and/or custom of not conducting security rounds/medical checks in a timely or meaningful manner.

217. That the actions of the Defendants of allowing correctional and medical officers to skip security rounds/medical checks, not perform security rounds/medical checks, and/or not perform meaningful security rounds/medical checks were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

218. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

219. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's Constitutional, Civil, and Statutory Rights, which lead to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson

220. That the above-mentioned policies, practices, and/or customs, as well as the acts and omissions of the Defendants were a direct and proximate cause of the injuries and damages

suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

**<u>Count IV: Violation of the Americans with Disabilities Act</u>**
42 U.S.C. § 12101, et seq.
*Against Defendants Rappahannock Regional Jail Authority, Rappahannock Creative Health Care, Medical Defendants & Hearing Officers*

221. Plaintiff adopts and incorporates paragraphs 1 through 220 above as if fully set forth herein.

222. Plaintiff states this cause of action against Defendants in their individual capacities.

223. Prior to her incarceration at RRJ, Plaintiff was diagnosed with schizoaffective disorder, a disease characterized by delusions (false beliefs), hallucinations (seeing or hearing things that don't exist), unusual physical behavior, and disorganized thinking or speech when left untreated. Individuals with schizoaffective disorder often have difficulty distinguishing what sights, sounds and experiences are real or what they are imagining.[16]

224. Plaintiff is currently housed in a halfway house in the mental health ward system of Maryland.

225. Plaintiff's symptoms of delusions, hallucinations and disorganized thinking or speech, which would otherwise substantially limit her major life activities, can be ameliorated through a combination of medication and mental health services.

226. Plaintiff is a qualified individual with a disability as defined in 42 U.S.C. §12131(2).

[16] *See* Schizophrenia, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services, available at https://www.samhsa.gov/mental-health/schizophrenia.

227. Plaintiff is entitled not to be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity, on the basis of disability. See 42 U.S.C. § 12132.

228. RRJ is a public entity as defined by 42 U.S.C. § 12131(1)(B).

229. Defendants were aware of Plaintiff's disability based on her medical records, which indicated that she had schizoaffective disorder, and her Classification Interview, which identified that she had a "psychological impairment," "medical problem".

230. Officer Defendants and Medical Defendants were aware of Plaintiff's pregnancy having administered a pregnancy test on June 21, 2021.

231. Officer Defendants and Medical Defendants discriminated against Plaintiff on the basis of her disability by repeatedly denying Plaintiff's virtually daily written and oral requests for adequate medical care.

232. Officer Defendants discriminated against Plaintiff on the basis of her disability by denying her equal access to basic hygienic needs such as regular showers.

233. Officer Defendants discriminated against Plaintiff on the basis of her disability by denying her equal access to the paperwork necessary to formally request medical and mental health services.

234. Officer Defendants discriminated against Plaintiff on the basis of her disability by refusing her oral requests to see a nurse, and harassing and humiliating her when she attempted to advocate for her medical needs.

235. Defendant Hearing Officers discriminated against Plaintiff on the basis of her disability by proceeding with disciplinary hearings against Plaintiff when she was obviously not competent to proceed and initiating punishments, which included the denial of basic benefits to

prisoners and expanded time in administrative segregation, due to or in spite of her inability to participate in the proceedings against her.

236. Defendant Hearing Officers discriminated against Plaintiff on the basis of her disability by proceeding with disciplinary hearings against Plaintiff for a failure to comply violations that were clearly the result of Ms. Johnson's mental health condition and not any willful violation of a genuine directive from officers.

237. Defendants' discrimination contributed to the worsening of Plaintiff's mental health condition.

238. Defendants' discrimination caused Plaintiff to be isolated and largely ignored in administrative segregation for the duration of her incarceration at RRJ.

239. Defendants' discrimination, and the punishment of extended isolation in administrative segregation they imposed on Plaintiff on the basis of her disability, caused Plaintiff to be completely alone and unable to access assistance when she went into labor on the night of August 2, 2021.

240. The actions undertaken by Defendants constitute discrimination on the basis of disability that prevented Ms. Johnson from equally accessing medical and public services.

## Count V: Violation of the Rehabilitation Act

29 U.S.C. § 794(a)

*Against Defendants Rappahannock Regional Jail Authority, Rappahannock Creative Health Care, Medical Defendants & Hearing Officers*

241. Plaintiff adopts and incorporates paragraphs 1 through 240 above as if fully set forth herein.

242. Plaintiff states this cause of action against Defendants in their individual capacities.

243. Plaintiff suffers from a schizoaffective disorder and is currently housed in a halfway house in the mental health ward system of Maryland.

244. Plaintiff is a qualified individual as defined by 29 U.S.C. § 705(20).

245. Plaintiff is entitled not to be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any executive agency or by the United States Postal Service solely by reason of her disability. 29 U.S.C. § 794(a).

246. Defendant RRJA is an entity of the Commonwealth of Virginia to which federal financial assistance is extended. *See* 29 U.S.C. § 794(b)(1)(B).

247. Officer Defendants and Medical Defendants were aware of Plaintiff's pregnancy having administered a pregnancy test on June 21, 2021.

248. Officer Defendants and Medical Defendants discriminated against Plaintiff on the basis of her disability by repeatedly denying Plaintiff's virtually daily written and oral requests for adequate medical care.

249. Officer Defendants discriminated against Plaintiff on the basis of her disability by denying her equal access to basic hygienic needs such as regular showers.

250. Officer Defendants discriminated against Plaintiff on the basis of her disability by denying her equal access to the paperwork necessary to formally request medical and mental health services.

251. Officer Defendants discriminated against Plaintiff on the basis of her disability by refusing her oral requests to see a nurse, and harassing and humiliating her when she attempted to advocate for her medical needs.

252. Defendant Hearing Officers discriminated against Plaintiff on the basis of her disability by proceeding with disciplinary hearings against Plaintiff when she was obviously not competent to proceed and initiating punishments, which included the denial of basic benefits to prisoners and expanded time in administrative segregation, due to or in spite of her inability to participate in the proceedings against her.

253. Defendant Hearing Officers discriminated against Plaintiff on the basis of her disability by proceeding with disciplinary hearings against Plaintiff for a failure to comply violations that were clearly the result of Ms. Johnson's mental health condition and not any willful violation of a genuine directive from officers.

254. Defendants' discrimination contributed to the worsening of Plaintiff's mental health condition

255. Defendants' discrimination caused Plaintiff to be isolated and largely ignored in administrative segregation for the duration of her incarceration at RRJ. Defendants' discrimination, and the punishment of extended isolation in administrative segregation they imposed on Plaintiff on the basis of her disability, caused Plaintiff to be completely alone and unable to access assistance when she went into labor on the night of August 2, 2021.

256. The actions undertaken by Defendants constitute discrimination on the basis of disability that prevented Ms. Johnson from equally accessing medical and public services.

## Count VI: Violation of the Patient Protection and Affordable Care Act

42 U.S.C.A. § 18116

*Against Rappahannock Creative Health Care and Medical Defendants*

257. Plaintiff adopts and incorporates paragraphs 1 through 256 above as if fully set forth herein.

258. Plaintiff has a clearly established right under the Patient Protection and Affordable Care Act ("PPACA") to not be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving federal financial assistance, on the basis of her disabilities.

259. Defendant RCHC and/or RRJA receive federal financial assistance for health programs.

260. Medical Defendants denied Plaintiff health care by failing to provide her access to appropriate prenatal care, including access to qualified medical professionals, routine physical examinations, and screening and diagnostic tests, including an ultrasound during her first trimester, bloodwork and testing, and fetal heartrate and other monitoring.

261. Medical Defendants denied Plaintiff health care by failing to properly provide Plaintiff appropriate medication to treat her mental health symptoms, failing to provide Plaintiff access to mental health professionals who could better address her worsening mental health condition, and failing to seek other treatment options or transfer when it became clear that Plaintiff's condition was significantly worsening.

**Count VII: Wrongful Death**

Va. Code §§ 8.01-50

*Against Defendants Rappahannock Regional Jail Authority, Rappahannock Regional Health Care, Peter Ober, Officer Defendants, Barbara Meade, Medical Defendants & Medical Officers*

262. Plaintiff adopts and incorporates paragraphs 1 through 261 above as if fully set forth herein.

263. Plaintiff's child has the right to bring an action for death by wrongful act because Plaintiff's child died as a result of Defendants' gross negligence. *See* Va. Code Ann. § 8.01-50 (A).

264. Plaintiff is the personal representative of Baby Boy Johnson.

265. Plaintiff may bring an action for death by wrongful act on behalf of her child. *See* Va. Code Ann. § 8.01-50 (C).

266. Virginia law imposes a duty of care on medical staff and personnel to protect the health and safety of persons in their care.

267. At all times relevant herein, Defendants had an affirmative duty to provide Plaintiffs Ms. Johnson and Baby Boy Johnson with appropriate medical care and humane and appropriate treatment in a manner consistent with Virginia law and the prevailing standards of care.

268. The acts and omissions herein constitute violations of the standards of care with respect to Baby Boy Johnson by persons licensed by the Commonwealth of Virginia to provide healthcare as physicians and nurses.

269. The Medical Defendants breached their duties of care when they failed to adequately treat Ms. Johnson's mental health conditions.

270. According to the National Commission on Correctional Health Care, correctional facilities have a duty to provide appropriate prenatal care, including medical examinations by a provider qualified to provide prenatal care and prenatal laboratory and diagnostic tests in accordance with national guidelines.

271. Medical Defendants breached their duty of care by failing to provide the Plaintiff with adequate prenatal care, including any medical examination by a provider qualified to provide prenatal care.

272. Medical Defendants breached their duty of care by failing to provide the Plaintiff with adequate prenatal laboratory and diagnostic tests, including the first trimester ultrasound or any bloodwork or fetal heartrate monitoring.

273. The Virginia Department of Corrections mandates twenty-four-hour emergency medical services be available in its facilities, and complaints be handled immediately. VDOC OP 720, IIB.

274. Correctional Officer Defendants on duty the night of August 2, 2021 into the early morning of August 3, 2021 also breached their duty of care by failing to respond to Plaintiff's pleas for medical assistance, both verbally into the hallway and through the emergency system installed in her cell.

275. Officer Defendants on duty the night of August 2, 2021 into the early morning of August 3, 2021 breached their duty of care by failing to appropriately follow the directives of mental health care professionals, who established that Plaintiff needed to be checked on in thirty-minute intervals to ensure her continued wellbeing.

276. Officer Defendants on duty the night of August 2, 2021 into the early morning of August 3, 2021 breached their duty of care by failing to provide assistance to Ms. Johnson during a clear medical emergency, the premature birth of Baby Boy Johnson.

277. As a direct and proximate result of Defendants' actions, Plaintiff gave birth two months early, unaided and alone, in her cell.

278. As a direct and proximate result of the actions of Defendants, Baby Boy Johnson was denied the life-saving medical treatment he needed for at least five hours.

279. As a direct and proximate result of the actions of Defendants, Baby Boy Johnson was not diagnosed with and treated for chorioamnionitis.

280. As a direct and proximate result of the actions of Defendants, Baby Boy Johnson died where he was born, in a prison cell at RRJ, of a an eminently treatable infection.

**<u>Count VIII: Gross Negligence</u>**

Virginia Common Law

*Against Defendants Rappahannock Regional Jail Authority, Rappahannock Creative Health Care, Officer Defendants, Medical Defendants*

281. Plaintiff adopts and incorporates paragraphs 1 through 280 above as if fully set forth herein.

282. At all times relevant to this case, Defendants acted within the scope of their employment duties and their conduct is thus imputable to the RRJA.

283. Defendants had duties to exercise reasonable and ordinary care with regard to Plaintiff.

284. Defendants were aware that Plaintiff was pregnant during the time of her confinement following a positive pregnancy test administered by the RRJ medical staff.

285. Medical Defendants exhibited indifference towards Plaintiff and an utter disregard of prudence amounting to complete neglect for her safety when they failed to provide Plaintiff with any form of prenatal care, including failing to provide an ultrasound that Plaintiff requested weeks prior to giving birth, alone, in her cell.

286. Medical Defendants exhibited indifference towards Plaintiff and an utter disregard of prudence amounting to complete neglect for her safety when they failed to provide the Plaintiff with necessary medication and treatment to address her drastically worsening mental health treatment, failed to provide her access to therapy or mental health specialists, and failed transfer her to a location better equipped to provide her care in light of her rapidly deteriorating condition.

287. Officer Defendants exhibited indifference towards Plaintiff and an utter disregard of prudence amounting to complete neglect for her safety when they ignored her regular requests for assistance and medical attention.

288. When placing an individual diagnosed with schizoaffective disorder and experiencing active symptoms in administrative segregation, the Virginia Department of Behavioral Health and Developmental Services has established standards requiring officers and medical professionals to evaluate the impact of such restrictive housing on the mental health of the inmate.[17]

289. Medical staff issued a Mental Health Directive requiring Mental Health Observation of Ms. Johnson on thirty-minute intervals.

290. Officer Defendants on duty the afternoon of August 2, 2021 through the early morning of August 3, 2021 exhibited indifference towards the Plaintiff and an utter disregard of prudence amounting to complete neglect for her safety and wellbeing by failing to properly adhere to that directive and failing to exercise any degree of care in their checks to notice that Ms. Johnson had broken her water, gone into labor, and delivered a baby, despite her own efforts to inform them of that fact.

291. Officer Defendants on duty the afternoon of August 2, 2021 through the early morning of August 3, 2021 exhibited indifference towards Plaintiff and an utter disregard of prudence amounting to complete neglect for her safety when they ignored her pleas, both shouted and expressed through the medical emergency intercom system, for assistance both before and after her labor.

[17] Mental Health Standards for Virginia's Local and Regional Jails, Department of Behavioral Health and Developmental Services (August 31, 2018).

292. Defendants were aware of their conduct and also were aware, from knowledge of existing circumstances and conditions, that their conduct would result in injury to Plaintiff.

293. As a direct and proximate result of the indifference towards Plaintiff and utter disregard of prudence amounting to complete neglect for her safety, Officer Defendants forced Plaintiff to give birth, unaided and alone, in her cell.

294. As a direct and proximate result of the indifference towards Plaintiff and utter disregard of prudence amounting to complete neglect for her safety, Officer Defendants denied Baby Boy Johnson the medical treatment he needed for at least five hours after his birth.

295. As a direct and proximate result of the indifference towards Plaintiff and utter disregard of prudence amounting to complete neglect for her safety, Officer Defendants caused the death of Baby Boy Johnson from an eminently treatable infection.

296. As a direct and proximate result of the indifference towards Plaintiff and utter disregard of prudence amounting to complete neglect for her safety, Officer Defendants caused Plaintiff to suffer further injury, including great physical pain, severe emotional distress, mental anguish, and the death of her newborn child.

## **Count IX: Negligence**

Virginia Common Law

*Against Officer Defendants & Medical Defendants*

297. Plaintiff adopts and incorporates paragraphs 1 through 296 above as if fully set forth herein.

298. At all times relevant to this case, Officer Defendants and Medical Defendants acted within the scope of their employment duties and their conduct is thus imputable to the RRJA.

299. Defendants had duties to exercise reasonable and ordinary care with regard to Plaintiff.

300. Defendants had duties to exercise reasonable and ordinary care with regard to Plaintiff.

301. Defendants were aware that Plaintiff was pregnant during the time of her confinement following a positive pregnancy test administered by the RRJ medical staff.

302. Medical Defendants breached their duty to exercise reasonable care with regard to the Plaintiff when they failed to provide Plaintiff with any form of prenatal care, including failing to provide an ultrasound that Plaintiff requested weeks prior to giving birth, alone, in her cell.

303. Medical Defendants breached their duty to exercise reasonable care with regard to the Plaintiff when they failed to provide the Plaintiff with necessary medication and treatment to address her drastically worsening mental health treatment, failed to provide her access to therapy or mental health specialists, and failed transfer her to a location better equipped to provide her care in light of her rapidly deteriorating condition.

304. Officer Defendants breached their duty to exercise reasonable care with regard to the Plaintiff when they ignored her regular requests for assistance and medical attention.

305. When placing an individual diagnosed with schizoaffective disorder and experiencing active symptoms in administrative segregation, the Virginia Department of Behavioral Health and Developmental Services has established standards requiring officers and medical professionals to evaluate the impact of such restrictive housing on the mental health of the inmate.[18]

306. Medical staff issued a Mental Health Directive requiring Mental Health Observation of Ms. Johnson on thirty-minute intervals.

[18] Mental Health Standards for Virginia's Local and Regional Jails, Department of Behavioral Health and Developmental Services (August 31, 2018).

307. Officer Defendants on duty the afternoon of August 2, 2021 through the early morning of August 3, 2021 breached their duty to exercise reasonable care with regard to the Plaintiff when they failed to properly adhere to that directive and failing to exercise any degree of care in their checks to notice that Ms. Johnson had broken her water, gone into labor, and delivered a baby, despite her own efforts to inform them of that fact.

308. Officer Defendants on duty the afternoon of August 2, 2021 through the early morning of August 3, 2021 breached their duty to exercise reasonable care with regard to the Plaintiff when they ignored her pleas, both shouted and expressed through the medical emergency intercom system, for assistance both before and after her labor.

309. Defendants were aware of their conduct and also were aware, from knowledge of existing circumstances and conditions, that their conduct would result in injury to Plaintiff.

310. As a direct and proximate result of their breach of their duty of care towards Plaintiff, Officer Defendants forced Plaintiff to give birth, unaided and alone, in her cell.

311. As a direct and proximate result of their breach of their duty of care towards Plaintiff, Officer Defendants denied Baby Boy Johnson the medical treatment he needed for at least five hours after his birth.

312. As a direct and proximate result of their breach of their duty of care towards Plaintiff, Officer Defendants caused the death of Baby Boy Johnson from an eminently treatable infection.

313. As a direct and proximate result of their breach of their duty of care towards Plaintiff, Officer Defendants caused Plaintiff to suffer further injury, including great physical pain, severe emotional distress, mental anguish, and the death of her newborn child.

**Count X: Intentional Infliction of Emotional Distress**

Virginia Common Law

*Against Defendants Rappahannock Regional Jail Authority (RRJA), Officer Defendants & Hearing Defendants*

314. Plaintiff adopts and incorporates paragraphs 1 through 313 above as if fully set forth herein.

315. At all times relevant to this case, Defendants acted within the scope of their employment and their conduct is thus imputable to the Rappahannock Regional Jail Authority.

316. Officer Defendants intentionally and recklessly caused Ms. Johnson to suffer severe emotional distress by repeatedly denying or ignoring her repeated requests for medical assistance and basic hygienic items like showers and clean clothes, ignoring her cries for help and leaving her alone in a cell to endure labor and delivery, keeping her in the totality of these circumstances for at least five hours after giving birth to a living newborn, removing her child and isolating her in a separate cell after they had been discovered.

317. Defendant Hearing Officers intentionally and recklessly caused Ms. Johnson to suffer severe emotional distress by imposing extended time in administrative segregation as punishment for uncontrollable aspects of her mental illness.

318. Defendants RRJA, RCHC, Officer James Robinson and Corporal David Dallek intentionally and recklessly caused Ms. Johnson to suffer severe emotional distress by forcibly separating her from her child, failing to allow her time to say goodbye, depriving her of the ability to name her child, and depriving her of the ability to have a funeral for her child.

319. The conduct of the Defendants was outrageous and intolerable and a violation of their duties as peace officers to uphold and enforce the law.

320. The behavior of the Officer Defendants and RRJA the evening of August 2, 2021 into the early morning of August 3, 2021 proximately caused long-term, life-altering mental consequences for Ms. Johnson.

321. The stress Ms. Johnson experienced from the collection of these events significantly worsened her mental state, and Doctors who treated Ms. Johnson indicated that she was in the midst of an active psychotic break when transferred to Stafford hospital after the birth of her child.

322. The trauma and grief resulting from Defendant's actions was so severe that Ms. Johnson remained at Western State Hospital for over four months before she was deemed competent and released.

323. The actions described herein constitute the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Virginia.

## VI. DAMAGES

Plaintiff, Ms. Johnson, has suffered the following injuries for which she seeks full compensation under the law:

1. Widespread physical injuries, and the death of her child, resulting from untreated medical conditions while in Defendants' custody;
2. Pain and suffering;
3. Mental and emotional distress.

Plaintiff, Estate of Baby Boy Johnson, suffered the following injury for which Ms. Johnson seeks full compensation under the law.

4. Death.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court:

(a) DECLARE that Defendants' conduct violated the Eighth and Fourteenth Amendments to the United States Constitution; the Americans with Disabilities Act; the Rehabilitation Act; the Patient Protection and Affordable Care Act; and Virginia common law through the torts of Medical Malpractice resulting in Wrongful Death, Gross Negligence, Negligence, Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress.

(b) ENTER JUDGMENT holding the appropriate Defendants jointly and severally liable to plaintiff for compensatory damages, punitive damages, and other damages recoverable under the laws of the Commonwealth of Virginia;

(c) AWARD compensatory and punitive damages in an amount to be determined by a jury;

(d) AWARD Plaintiff her costs and reasonable attorney's fees[19]; and

(e) GRANT such other and further relief as the Court deems just and proper.

Dated: August 1, 2023

Respectfully submitted,

*s/ Joshua Erlich*
Joshua Erlich (VSB No. 81298)
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd. #700
Arlington, VA 22201
Tel: (703) 791-9087
Fax: (703) 722-8114
jerlich@erlichlawofice.com

*s/ Aderson Francois*
Aderson Francois
Nicole E. Molinaro

[19] 42 U.S.C. 1988.

Genevieve Mesch
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 352
Washington, DC 20001
Phone: (202) 661-6721
Aderson.Francois@georgetown.edu
Nicole.Rheault@georgetown.edu
Genevieve.Mesch@georgetown.edu

*Pro Hac Vice to be filed*

*Attorneys for Plaintiff*