IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JEMIKA JOHNSON,

and

ESTATE OF BABY BOY JOHNSON,

*Plaintiffs,*

v.

RAPPAHANNOCK REGIONAL JAIL
AUTHORITY, and SUPERINTENDENT
KEVIN HUDSON, and MAJOR GREGORY
MCRAE, and CORPORALS PAUL
WALLACE, DOUGLAS JOHNSON,
PATRICK RIVERSON, and LIEUTENANTS
CHRISTOPHER CANDLER, VICTOR REID,
and OFFICERS GREGORY COLEMAN,
TONY COLES, JOSEPH JACKSON,
PATRICK O'CONNOR, TERRENCE
SHELL, BROCK NEWTON, and JARED
PAUL, and SERGEANTS SHAWN
CONNOLLY, STEPHENIE BROWN, PETER
TEYE, DIANA GLADMON, AUSTIN
STOY, and  FIRST SERGEANTS JAMES
SCHMITZ, and DAVID GONIER, SR.;

and

BARBARA MEADE, LAURA HEDDEN,
RN, HELENA SANGOE, LPN, EDWARD
ADUSEI, LPN;

and

RAPPAHANNOCK CREATIVE HEALTH
CARE, and PETER C. OBER

and

RAPPAHANNOCK COMMUNITY
SERVICES BOARD, and JAMES MACKIE,
MHT, JANET VICTORY, MHCM, PORTIA
BENNETT, TRICIA JACKSON, DCM,

Case No. 1:23-cv-01024  **(LMB/WEF)**

**JURY TRIAL DEMANDED**

AMANDA FISHER, MNHP, and Medical
Does 1 & 2

*Defendants.*

## COMPLAINT

**COMES NOW the Plaintiff, Jemika Johnson, by counsel, and alleges as follows:**

## I.   INTRODUCTION

1.      When Jemika Johnson ("Ms. Johnson" or "Plaintiff") arrived at Rappahannock Regional Jail ("RRJ" or "the Jail") on May 19, 2021, she was approximately four months pregnant. Just ten weeks later, she left RRJ after giving birth alone in her isolation cell, without medical assistance or medication. Her baby died in her arms before anyone at RRJ even noticed that she had given birth. She screamed for help, but no one answered.

2.      Individuals employed or contracted to provide medical services at RRJ confirmed her pregnancy through a positive pregnancy test on June 21, 2021. Those same individuals also knew of Ms. Johnson's diagnosis of Schizophrenia and her history of severe mental health issues that required management through psychiatric medication. Despite this knowledge and the clear ongoing symptoms of psychosis documented by RRJ's correctional officers and medical staff, Ms. Johnson remained completely unmedicated, was never seen by a licensed psychiatrist or physician, and never received a prenatal examination. Instead, Ms. Johnson was placed in isolated confinement for behavioral issues, where her physical and mental state deteriorated for the duration of her time at RRJ.

3.      At approximately 2:00 a.m. on August 3, 2021, Ms. Johnson went into premature labor, alone in her cell. She screamed for help. No one answered. Ms. Johnson then gave birth alone in her cell and saw her newborn child breathing and alive. Still, no one came to help her. She repeatedly pressed the emergency call button but did not receive a response.

4.      Over five hours later, at 7:11 a.m., Defendant Corporal Paul Wallace finally checked on Ms. Johnson and found her and her infant child in a pool of blood. Ms. Johnson and the infant were taken to the hospital, where her infant child was pronounced dead.

5.      The hospital determined Ms. Johnson was in the midst of an active psychotic break. Once she was stabilized, she was transferred to Western State Hospital for mental health treatment.

6.      An autopsy of her child revealed that the cause of the child's death was an infection; acute chorioamnionitis, a common condition which would have been identifiable and easily treatable with antibiotics, if Ms. Johnson had received medical care.

7.      The instant lawsuit brings claims against Defendants for violating the constitutional, civil, and statutory rights of Jemika Johnson and her deceased infant child, Baby Boy Johnson, causing Ms. Johnson and her infant child to suffer damages, injuries, and ultimately the infant child's death.

8.      Prior to Ms. Johnson's incarceration, she was taking her medication, living independently, and surrounded by her friends and family. However, while in Defendants' custody, Ms. Johnson's mental health deteriorated to the point of crisis, and she was forced to give birth alone in her cell, with no response to her pleas for help. Baby Boy Johnson died in the cell he was born in.

## II.      JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, as the action asserts claims arising under the U.S. Constitution and federal civil rights laws of the United States. Jurisdiction is also conferred by 42 U.S.C. § 1983 for violations of Plaintiff's rights under the United States Constitution.

10. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims under state laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants are subject to the personal jurisdiction of this Court and the events giving rise to the claims occurred in Stafford County in Virginia.

### III.    PARTIES

#### A. <u>Plaintiffs</u>

12. Plaintiff Jemika Johnson ("Plaintiff" or "Ms. Johnson") is a 28-year-old adult citizen of the United States. At all times material hereto, Ms. Johnson was a pretrial detainee being held at RRJ in Stafford County, Virginia, and was entitled to all rights, privileges, and immunities accorded as a resident of the Commonwealth of Virginia, and as a citizen of the United States. At all times material hereto, Ms. Johnson was pregnant while being detained at RRJ under the direct custody, control and supervision of the Defendants.

13. Plaintiff Estate of Baby Boy Johnson, represents the unnamed decedent whose serious medical needs were ignored and neglected while he was in the custody and under the care and control of Defendants, all of whom the Plaintiffs relied upon to provide adequate medical care. As a result, Baby Boy Johnson died in the very same place he was born, in a cell at RRJ. At all times material hereto, Baby Boy Johnson was entitled to all rights, privileges, and immunities accorded by the Constitution of the United States.

#### B. <u>Defendants</u>

14. Rappahannock Regional Jail Authority ("RRJA") oversees the operations of RRJ, an adult correctional facility in Stafford, Virginia, operated to serve Stafford, Spotsylvania, and

4

King George counties as well as the City of Fredericksburg. Under Va. Code. § 53.1-95.7, RRJA is "an instrumentality exercising public and essential governmental functions" that can be sued in its own name.

15.     Defendant, Superintendent Kevin Hudson, is an adult citizen of the United States and a resident of the Commonwealth of Virginia. At all times material hereto, Defendant Hudson was the Superintendent of RRJ and was ultimately responsible for the health, safety, security, welfare, and humane treatment of all individuals in the custody of RRJ, including Ms. Johnson and her infant child. At all times material hereto, Defendant Hudson oversaw, supervised, and had direct control over the management and operations of RRJ, and was responsible for the Jail's policies and procedures, as well as staff training. At all times material hereto, Defendant Hudson had control and authority over RRJ's contract with Defendant Rappahannock Creative Health Care ("RCHC") as well as the contract with Defendant Rappahannock Area Community Services Board ("RACSB"). At all times material hereto, Defendant Hudson was deliberately indifferent to the serious medical needs and constitutional rights of Ms. Johnson and her infant child and ignored Jail staff's lack of sufficient training in policies and procedures, both written and unwritten, to adequately address individuals in need of medical and psychiatric care, including Ms. Johnson. Defendant Kevin Hudson is sued in his individual capacity based on supervisory liability.

16.     Upon information and belief, Defendants Major Gregory McRae, Corporal Paul Wallace, Lieutenant Christopher Candler, Lieutenant Victor Reid, Corporal Douglas Johnson, Sergeant Diana Gladmon, Sergeant Stephenie Brown, Sergeant Peter Teye, Sergeant Austin Stoy, Officers Gregory Coleman, Tony Coles, Brock Newton, Joseph Jackson, Patrick O'Connor, and Terrence Shell (collectively, "RRJA Officer Defendants"), were employees, officers, or deputies of RRJ between May 19, 2021, and August 3, 2021. RRJA Officer Defendants were employed by

the Jail and acting under the color of state law at all times relevant to the events in this Complaint. At all times material thereto, RRJA Officer Defendants were responsible for the health, safety, security, welfare, and humane treatment of all individuals within the custody of the Jail, including Ms. Johnson and her infant child. RRJA Officer Defendants are sued in their individual and official capacities.

a.  Defendant Major Gregory McRae compiled all of the testimony to include incident reports surrounding Baby Boy Johnson's birth.

b.  Defendant Corporal Paul Wallace was the Administrative Segregation Corporal on the night of August 2, 2021, into the early morning of August 3, 2021. According to shift logs, he performed checks on Ms. Johnson's cell at 06:33 and 06:57 AM, before discovering Baby Boy Johnson's birth during his check at 07:09 AM.

c.  Defendant Lieutenant Christopher Candler was on shift the night of August 2, 2021 into the early morning of August 3, 2021.

d.  Defendant Officer Tony Coles was an Administrative Segregation Officer on shift the night of August 2, 2021 into August 3, 2021. According to shift logs, Defendant Officer Coles performed a check on Ms. Johnson's cell at 05:57 AM and reported seeing nothing unusual.

e.  Defendant Officer Joseph Jackson was on shift the night of August 2, 2021 into the early morning of August 3, 2021. According to security logs, Defendant Officer Jackson performed checks on Ms. Johnson's cell at 02:39, 04:04, 04:36, 05:18 (at which point he allegedly served Ms. Johnson breakfast), and 05:31 AM.

    f.   Defendant Officer Patrick O'Connor was on shift the night of August 2, 2021 into the early morning of August 3, 2021. According to security logs, Defendant Officer O'Connor performed checks on Ms. Johnson's cell at 03:09 and 03:28 AM.

    g.   Defendant Officer Terrence Shell was an employee, officer, or deputy of RRJ between May 19, 2021 and August 3, 2021. During the relevant period, Defendant Officer Shell was often responsible for performing checks on Ms. Johnson's cell.

17.    Defendants Major Gregory McRae, Sergeant Shawn Connolly, Sergeant Stephenie Brown, First Sergeant James Schmitz, Sergeant Peter Teye, and Officer Jared Paul (collectively, "RRJA Hearing Officers") were employees, officers, or deputies of RRJ between May 19, 2021 and August 3, 2021 and were responsible for evaluating incident reports involving Ms. Johnson. The RRJA Hearing Officers oversaw either the disciplinary hearings or the Institutional Classification Committee ("ICC") hearings against Ms. Johnson. Defendant Hearing Officers were employed by the Jail and acting under the color of state law at all times relevant to the events in this complaint, and were responsible for the health, safety, security, welfare and humane treatment of all individuals in their custody at the Jail, including Ms. Johnson and her infant child. Defendant Hearing Officers are sued in their individual and official capacities.

    a.   Defendant Major Gregory McRae was the Director of Security and Confinement for the purposes of the ICC Hearing Report on June 29, 2021, and agreed with the recommendation that Ms. Johnson should remain in Administrative Segregation and be referred to Mental Health.

    b.   Defendant Sergeant Shawn Connolly was a correctional officer employed by RRJ and was on duty on June 3, 2021. Defendant Sergeant Connolly presided as Hearing

7

Officer over an institutional hearing against Ms. Johnson for the offense code of I-22 (failure to obey orders of Jail staff).

c. Defendant Sergeant Stephenie Brown was a correctional officer employed by RRJ and was on duty on June 21, 2021. Defendant Sergeant Brown presided as Hearing Officer over an institutional hearing against Ms. Johnson for the offense code of I-22 (failure to obey orders of Jail staff).

d. Defendant Sergeant Peter Teye was a correctional officer employed by RRJ and on duty on July 7, 2021. Defendant Sergeant Teye presided as Hearing Officer over an institutional hearing against Ms. Johnson for the offense code of I-05 (Assault or attempted assault on staff).

e. Defendant Officer Jared Paul was a correctional officer employed by RRJ. Defendant Jared Paul served the Rappahannock Regional Jail Charge Sheet against Ms. Johnson for the offense code of 1-22 (Failure to obey orders).

18. Defendant Rappahannock Creative Health Care ("RCHC") is a general partnership under contract with the RRJA to provide medical care to individuals within the custody of the Jail on all dates discussed *infra*. The contract also required RCHC to develop all necessary policies and procedures to ensure that the medical care provided at the Jail complied with the requirements of federal and state law. At all times relevant, RCHC primarily operated out of and maintained its principal place of business in Fredericksburg, Virginia.

19. Defendant Peter C. Ober is and was the managing partner of RCHC and the signatory of the contract under which RCHC was obligated to provide constitutionally adequate medical care to the detainees being housed at RRJ. Defendant Ober also worked as a Physician's Assistant (PA) at RRJ and was, at all times relevant, employed by RRJA and/or RCHC to, among

other things, provide medical care to individuals within the custody of the Jail, including Ms. Johnson. At all relevant times, Defendant Ober was acting within the course and scope of his employment with RRJA and/or RCHC and under color of state law. Defendant Ober is sued in his individual capacity.

20.     Nurse Barbara Meade was a Health Services Administrator employed at RRJ between May 19, 2021 and August 3, 2021 who was involved in Ms. Johnson's treatment throughout the relevant period. As Health Services Administrator, Defendant Meade was responsible for providing daily nursing care and treatment to individuals in RRJ's custody, as well as ensuring that all care provided to individuals met applicable local, state, federal, and DOC standards. Defendant Meade is sued in her individual and official capacity.

21.     Upon information and belief, Defendants Laura Hedden, RN, Helena Sangoe, LPN, and Edward Adusei, LPN (collectively, "RRJA Medical Defendants") were, at all relevant times employed by RRJA and/or RCHC to, among other things, provide medical care to the individuals within the custody of the Jail. At all relevant times, the RRJA Medical Defendants were acting within the course and scope of their employment with RRJA and/or RCHC and under color of state law. The RRJA Medical Defendants are sued in their individual and official capacities.

  a.  Defendant Laura Hedden was a Registered Nurse (RN) employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment throughout the relevant period.

  b.  Defendant Helena Sangoe was a Licensed Practical Nurse (LPN) employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment throughout the relevant period.

9

c. Defendant Nurse Edward Adusei was an LPN employed at RRJ between May 19, 2021 and August 3, 2021, who was involved in Ms. Johnson's treatment during the relevant period. Defendant Adusei was also involved in Ms. Johnson's treatment when she was incarcerated at RRJ in 2020. At that time, Ms. Johnson was transferred for inpatient hospitalization due to her ongoing mental health challenges. Defendant Adusei was the medical staff member who recorded the results of Ms. Johnson's classification hearings on June 15, 2021, June 29, 2021, and July 13, 2021, and was the "ICC Member (Medical)."

22. Defendant Rappahannock Area Community Services Board ("RACSB") is a medical contractor that provided mental health clinical treatment services for incarcerated persons at RRJ on all dates discussed *infra*. Their contract with RRJA also required RACSB to provide mental health case management services, psychiatric nurse practitioner services under the supervision of a board-certified psychiatrist, and emergency services by existing contract staff assigned to RRJ. At all times relevant, RACSB primarily operated out of and maintained its principal place of business in Fredericksburg, Virginia.

23. Defendants Amanda Fisher, MHNP, James Mackie, MHT, Janet Victory MHCM, Portia Bennett, and Tricia Jackson, DCM (collectively, "RACSB Mental Health Defendants") were, at all times relevant employed by RACSB to, among other things, provide mental health care to the individuals within the custody of the Jail. At all relevant times, the RACSB Mental Health Defendants were acting within the course and scope of their employment with RRJA and/or RACSB and under color of state law. These RACSB Mental Health Defendants are sued in their individual and official capacities.

10

a.  Defendant Amanda Fisher was a Psychiatric Mental Health Nurse Practitioner (MHNP) employed at RRJ between May 19, 2021 and August 3, 2021 who was involved in Ms. Johnson's treatment throughout the relevant period. Defendant Fisher was also involved in both Ms. Johnson's treatment when she was incarcerated at RRJ in 2020 and in the recommendation to screen Ms. Johnson for inpatient hospitalization due to her ongoing mental health challenges.

b.  Defendant James Mackie was a Mental Health Therapist (MHT) who treated Ms. Johnson during the relevant time. Defendant Mackie wrote the last note in Ms. Johnson's medical chart on July 21, 2021 before the birth of her son on August 3. The note stated that Ms. Johnson was experiencing hypomania and would be seen weekly by Mental Health.

c.  Defendant Janet Victory was a Mental Health Case Manager (MHCM) who treated Ms. Johnson during the relevant time. Defendant Victory wrote a note in Ms. Johnson's medical chart on June 11, 2021 which stated that Ms. Johnson was exhibiting psychotic behaviors.

d.  Defendant Portia Bennett was a Jail Services Coordinator who treated Ms. Johnson during the relevant time. A note from Ms. Johnson's medical chart on July 19, 2021 states that Defendant Laura Hedden, RN met with Defendant Bennett regarding Ms. Johnson's refusal of antipsychotic medication.

e.  Defendant Tricia Jackson was a Disability Case Manager (DCM) who treated Ms. Johnson during the relevant time. Defendant Jackson made multiple notes in Ms. Johnson's medical chart on July 19, 2021, September 2, 2021, and October 1, 2021.

f.  Medical Doe 1 is an Emergency Services Therapist who was assigned to "provide on-site assessment services" to Ms. Johnson.

g.  Medical Doe 2 is a Licensed Professional Counselor who should have been assigned to Ms. Johnson.

24.  At all times material hereto, all Defendants were acting under the color of state law, pursuant to their authority as officials, agents, contractors or employees of RRJ, within the scope of their employment as representatives of public entities and were deliberately indifferent to the constitutional and statutory rights of Ms. Johnson and her infant child.

## IV.   FACTUAL ALLEGATIONS[1]

### A.  Ms. Johnson's Condition

25.  Prior to her incarceration at RRJ, Ms. Johnson had been diagnosed with Schizoaffective Disorder, sometimes also described as Schizophrenia.

26.  When unmedicated, Ms. Johnson presents as disorganized in thinking and speech or detached from reality, experiences auditory or visual hallucinations, and has difficulty discerning what sights, sounds, and experiences are real and what she is imagining.

27.  Without the assistance of medication, Ms. Johnson's Schizophrenia impacts all aspects of her major life activities. Her hallucinations and inability to discern them from reality make it difficult for her to maintain employment, advocate for herself in medical settings, and participate meaningfully in her own defense.

28.  However, when Ms. Johnson is medicated, she is able to live independently and support herself financially. When taking the proper medication, Ms. Johnson does not present as having a disability.

---

[1] Unless otherwise indicated, the factual allegations are made upon reasonable knowledge, information, and belief.

29.     Since departing RRJ, Ms. Johnson spent significant time at Western State Hospital, followed by a residential treatment program for individuals with mental health conditions. She receives consistent medication and her mental health issues are well-managed. She has since completed the residential treatment program and secured employment.

**B. RCHC's Contract with RRJA**

30.     On May 22, 2019, RCHC entered into a contract with RRJA to provide medical care to the detainees being housed at the Jail. That contract contemplated that RCHC would provide such care for a two-year period of time, beginning on July 1, 2019 and ending on June 30, 2021.

31.     The contract included the option for three additional renewals of that contract, each for a period of one year.

32.     RRJ's publicly accessible information still lists the contract with RCHC as the controlling contract for both physical exams for new hires, and the provision of medical and dental services to the individuals detained at RRJ.

33.     In the original contract, RCHC expressly assumed a number of duties with respect to the provision of medical care to the Jail's detainees. Indeed, in defining the scope of the medical services to be performed by RCHC, the contract states:

> [RCHC] will accept supervisory responsibility for all medical staff in performance of their duties in accordance with the standard operation procedures of [the Jail] and the Medical Department's treatment guidelines.

34.     Moreover, the contract describes in detail the duties that RCHC and its agents were to perform with respect to the Medical Clinic at the Jail. These duties included (but are not limited to), the following:

    a.   Review of all daily sick call logs and nurse's notes for appropriateness of care;

    b.   Assisting with the development of a sick call program, to include the development of nursing protocols that ensure that patients in need of follow-up care are referred to an RCHC provider as medically necessary;

    c.   The supervision of the Jail's staff, to include ensuring that the Jail's staff rendered medical care in compliance with written protocols;

    d.   Assisting Jail staff with responses to grievances and complaints as they relate to the provision of medical care; and

    e.   Other such duties as will be developed in discovery.

**C.**    **RACSB's Contract With RRJA**

35.    On June 30, 2020, RACSB entered into a contract with RRJA to provide mental health care to the incarcerated persons being housed at the Jail. That contract contemplated that RACSB would provide such care beginning on July 1, 2020 and ending on June 30, 2021. This contract was renewed on June 30, 2021 and was valid from July 1, 2021 until June 30, 2022.

36.    In the contract, RACSB expressly assumed a number of duties with respect to the provision of mental health care to incarcerated persons at the Jail. These duties include:

    a.   To provide mental health clinical treatment services.

    b.   To provide mental health case management services.

    c.   To provide Psychiatric Nurse Practitioner services to assist with the management of mental health disorders of jail inmates under the supervision of a Board Certified Psychiatrist.

    d.   To provide emergency services by existing contract staff assigned to RRJ.

### D.  **RRJ's Policies and Procedures for Requests of Detained Individuals**

37.     All cells at RRJ are equipped with an intercom system which allows for communications between jail personnel and individuals in the custody of RRJ.

38.     After the evening lockdown, the intercom in each cell acts as an emergency call button to alert staff should an individual become ill.

39.     If an emergency call button is activated, Central Control is required to dispatch staff to investigate the situation.

40.     Individuals detained at RRJ regularly use the intercom button to converse with jail officials as well as to request emergency assistance.

41.     The intercom button in Ms. Johnson's cell was operating properly throughout her detention as she was able to reach jail officials through the use of the intercom system.

42.     Ms. Johnson used the intercom system on multiple occasions to inform RRJ staff that she was physically unwell, that she had basic hygiene needs that were not being met, and that she needed additional assistance from medical professionals.

43.     On multiple occasions Ms. Johnson shared that she was feeling unwell and made requests to see a nurse in three different ways: (1) through the intercom button, (2) by asking officers patrolling her unit, and (3) through grievance forms.

44.     Ms. Johnson's requests were often ignored or outright denied by RRJA Officer Defendants.

45.     Ms. Johnson did not have regular access to showers, clean clothes, and linens for the duration of her incarceration at RRJ, despite numerous requests made over the intercom system and to RRJA Officer Defendants patrolling her unit.

46.     Individuals detained at RRJ can also request assistance and medical treatment by filling out and submitting forms for consideration by jail officials.

47.     Officers at RRJ are supposed to give medical request forms to medical staff for their review.

48.     Upon receiving the form, officials are supposed to give the requesting individual a pink carbon copy of the form to indicate that the request had been submitted.

49.     Ms. Johnson made numerous requests for medical attention between her arrival on May 19, 2021 and the incident on August 3, 2021. These requests were made orally, through speaking informally to officials or utilizing her cell's intercom button, or in writing, through attempting to fill out request forms.

50.     The majority of Ms. Johnson's requests to the RRJA Officer Defendants were ignored or not responded to, and she believes that many were not recorded at all.

51.     RRJA Officer Defendants also repeatedly denied Ms. Johnson the forms needed to make requests for medical care and to document grievances.

52.     In particular, Defendants Officer Coleman and Officer Terrence Shell refused to provide Ms. Johnson with request forms on several occasions and instead responded to her request for a form by verbally humiliating her.

**E.    Ms. Johnson's Arrival at RRJ**

53.     On May 19, 2021, Ms. Johnson was booked at RRJ and housed in cell SP6-15.

54.     Ms. Johnson had previously been a pretrial detainee at RRJ on multiple occasions. Most recently, Ms. Johnson had been detained at RRJ from November 1, 2019 to February 6, 2020, and then from August 3, 2020 until October 16, 2020.

55.     During her detention at RRJ from November 1, 2019 to February 6, 2020, Ms. Johnson experienced significant mental health symptoms resulting from her Schizoaffective Disorder. During that time, Ms. Johnson demonstrated patterns of refusing to leave her cell for hearings, exhibiting signs of delusions and disorganized speech and thinking, failing to engage in self-care, and refusing to take her medication. During this detention, Ms. Johnson also expressed suicidal ideation and was placed on a full suicide watch.

56.     Due to the severity of her condition, Ms. Johnson was transferred to Western State Hospital for care.

57.     Western State Hospital is a mental health facility run by the Virginia Department of Behavioral Health and Developmental Services.

58.     Medical staff involved in Ms. Johnson's care during her November 2019 to February 2020 detention included Portia Bennett, Christian Holdbrook, Lyudmyla Miller and Edward Adusei.

59.     Upon Ms. Johnson's return to RRJ on August 3, 2020, her intake screening noted that she had "just got out of Western State" and that she was "schizoaffective."

60.     Maria Reid, the classification counselor who completed Ms. Johnson's Classification Interview on May 20, 2021, noted that Ms. Johnson had been transferred to Western State Hospital during her February 2020 detention.

61.     In Ms. Johnson's May 20, 2021 Classification Interview, under "Special Management Issues," the classification counselor marked the box for "psychological impairment," "suicide risk," and "medical problem." The Classification Interview also acknowledged that Ms. Johnson needed assessment for "limited physical capacity, acute illness," and that for emotional

stability she had "moderate impairment, requires monitoring." Ms. Johnson was recommended for both Mental Health Services and Medical Services.

62.     Further, on the RRJ Intake Classification Relocation Notice, issued on May 19, 2021, the Relocating Supervisor Corporal Gonier noted that Ms. Johnson had numerous alerts for mental health issues.

63.     The Medical Staff noted on her chart on May 19, 2021 that Ms. Johnson had been transferred from Prince George's County Jail without her medication, and that she had a history of schizophrenia and bipolar. The transfer documents from Prince George's County Jail reflected that Ms. Johnson was prescribed Olanzapine, an antipsychotic medication.

**F.  Rappahannock Regional Jail's Deliberate Indifference to Ms. Johnson's Mental Health and Pregnancy**

64.     Ms. Johnson was approximately four months pregnant when she was first admitted to RRJ.

65.     From the very beginning of her detention at RRJ, Ms. Johnson was showing obvious signs of psychosis, including delusions, disorganized thoughts, grandiose speech, and breaks with reality. It was clear that she was experiencing an ongoing mental health crisis. RRJA Medical Defendants, RACSB Mental Health Defendants, Peter Ober (collectively "named medical Defendants") and RRJA Officer Defendants were all aware of Ms. Johnson's escalating mental health symptoms.

66.     Despite these alarming symptoms, none of the Defendants assigned to provide medical care to Ms. Johnson took appropriate actions to treat or transfer her to a location that was equipped to treat her. Instead, the RRJA Officer Defendants and named medical Defendants

engaged in a cycle of punishing and isolating Ms. Johnson, while allowing her mental and physical health, and that of her unborn baby, to dangerously deteriorate.

67.     RACSB Mental Health Defendants knew that Ms. Johnson was prescribed medication to treat her Schizoaffective Disorder, but there is no indication that she was provided that medication or others after her arrival.

68.     From the beginning of her incarceration, Ms. Johnson was never medicated despite numerous staff members documenting her need and the adverse effects of being unmedicated on her mental health. As a result, Ms. Johnson's condition rapidly deteriorated and she became distrustful of further medication recommendations, which is a hallmark symptom of Schizoaffective Disorder.

69.     Despite documenting Ms. Johnson's subsequent refusals to take medication, there is no indication that any of the named medical Defendants made any attempt to determine whether Ms. Johnson had the capacity to make an informed decision regarding refusal of medication, despite Defendants' knowledge of Ms. Johnson's ongoing mental health symptoms and that she was unmedicated.

70.     There is no indication that Ms. Johnson's chart was referred to a physician upon her third refusal of medication as required by written jail protocol.[2]

71.     Contrary to RRJ policy,[3] when Ms. Johnson was diagnosed as pregnant, RRJA Officer Defendants and named medical Defendants did not provide the information necessary for

---

[2] *See* Section R-4 of the Regional Jail's policy and procedures manual regarding nursing care protocols for refusal to consent to treatment, which states that, "If inmate refuses mediation 3 times in a row, transfer chart to physician at next sick call for review."

[3] Regional Jail Policy No. 3.7.6 regarding Inmate Pregnancy provides that when Medical Staff confirm that an inmate is pregnant, Medical staff should notify the Inmate Services Manager and the inmate's Case Manager of the pregnancy. The Case Manager contacts the inmate to ascertain what arrangements will be made for her child if it is born while she is incarcerated, and assists the inmate in contacting family or friends to make arrangements for the child. If there is no one to accept responsibility for the child, the Case Manager contacts the Department of Social Services in the

Ms. Johnson to make decisions on behalf of herself and her baby, prepare for labor, or prepare for her baby's care after her incarceration.

72.     On June 2, 2021, Ms. Johnson was supposed to relocate to a different cell. When Officer Barlow tried to move her, she refused to leave her cell, and was charged by Officer Barlow for failure to obey orders of jail staff. Officer Barlow noted in his report that "Ms. Johnson is an ADA inmate and has behavioral issues." He also emailed Mental Health about the situation.

73.     On June 4, 2021, Ms. Johnson missed a court appearance due to mental health symptoms, including disorganized thinking and delusions. After initial attempts to get her to attend, Officers left Ms. Johnson in her cell and reported her non-compliance.

74.     On June 7, 2021, Hearing Officer Sergeant Connolly reported that Ms. Johnson was not present at the disciplinary hearing for failure to obey orders of jail staff. Sergeant Connolly read Ms. Johnson the charges through her cell door, and did not receive a response to multiple questions, including whether Ms. Johnson would like to participate in the hearing.

75.     There is no indication that Sergeant Connolly or any other staff attempted to determine whether Ms. Johnson had the capacity to understand the nature of the questions being asked or a recognition of her rights regarding the disciplinary hearing. Ms. Johnson was sentenced to three days of isolation as punishment.

76.     On June 9, 2021 Ms. Johnson was reported as refusing a sick call by Nurse Christian Holdbrook. No additional actions were taken by the medical staff to follow up.

77.     On June 15, 2021, Ms. Johnson was cleared to be placed in the general population.

---

county where the inmate resides. RRJ policy provides that arrangements must be made with the Department of Social Services for temporary custody of the child.

78.     However, on June 16, 2021, officers reported Ms. Johnson again was reported to have refused to relocate from where she was housed and was again charged with failure to obey orders of jail staff by Officer Cody Brooks.

79.     On June 21, 2021, officers again reported that Ms. Johnson refused to participate in the institutional disciplinary hearing on the charge of failure to obey orders of jail staff. Ms. Johnson again was unable to answer the questions on the charge sheet or sign it and was found guilty and sentenced to 3 days of isolation by Hearing Officer Sergeant Brown.

80.     Again, there is no indication that Sergeant Brown or any other staff attempted to determine whether Ms. Johnson had the capacity to understand the nature of the questions being asked or a recognition of her rights regarding the disciplinary hearing.

81.     RRJ knew that Ms. Johnson was pregnant on June 20, 2021, at the latest, because on that date, Ms. Johnson filled out an "Inmate Request Form" stating that she needed a pregnancy test, and that pregnancy test was returned positive.

82.     Upon information and belief, Defendant Peter Ober, PA, was responsible for providing medical care to Ms. Johnson.

83.     According to the National Commission on Correctional Health Care, Peter Ober "recruits and supervises correctional physicians, PAs, and NPs"[4] at RRJ.

84.     Peter Ober appears to be the only RCHC medical provider assigned to treat Ms. Johnson.

85.     Upon information and belief, no physician was assigned to provide medical care to Ms. Johnson.

---

[4] https://www.ncchc.org/introducing-cchp-cp-a-new-specialty-exam-for-physicians-nps-and-pas/

86.     Ms. Johnson's medical records do not indicate that any physician ever examined her while she was at RRJ.

87.     In fact, it does not appear that Peter Ober, though assigned to her care, ever examined Ms. Johnson.

88.     On June 21, 2021, Defendant Peter Ober prescribed Ms. Johnson prenatal tablets to take daily. Aside from being prescribed prenatal vitamins, it does not appear that Ms. Johnson ever received any other care, services, or treatment related to her pregnancy.

89.     On June 24, 2021, Ms. Johnson placed a medical request asking to see medical staff as soon as possible about pregnancy inquiries. This request was marked as received on June 24, 2021. Ms. Johnson was not seen by any medical staff.

90.     On June 25, 2021, Nurse Defendant Helena Sangoe, LPN, wrote a note for Defendant Amanda Fisher, MHNP, in Ms. Johnson's chart, describing the meeting with Ms. Johnson on June 11, 2021. Nurse Sangoe noted that Ms. Johnson's prescription for Olanzapine terminated June 17, 2021. Sangoe specifically noted that due to the severity of the mental illness it was "a risk to the health of the pregnancy to be untreated." Sangoe noted that Ms. Johnson should be placed on a list to be seen by Mental Health ASAP. Sangoe further requested that medical staff consider administering medication through injection for Ms. Johnson.

91.     Despite this report, Ms. Johnson was not seen by a Mental Health professional.

92.     On June 29, 2021, there was an incident in which Ms. Johnson was alleged to have thrown a juice cup at Officer Rush. As a consequence, Ms. Johnson was charged with officer assault, First Sergeant Epling placed her on "2 officer full restraint," and the incident was reported to Mental Health.

93.     Following this event, Ms. Johnson's housing classification was assessed by the ICC, who noted that they were referring Ms. Johnson to Mental Health, and that she would remain in administrative segregation until the disciplinary hearing and her isolation time was completed.

94.     On July 2, 2021, Ms. Johnson again missed a court appearance due to her mental health. Officer Kristie Davis and Officer Brandon Lake attempted to bring her to court but reported that Ms. Johnson refused to go because she did not believe that she had a court appearance. Ms. Johnson told the officers that she believed she had spoken to her mother and her lawyer and they had told her she did not have court.

95.     On July 2, 2021, Ms. Johnson was scheduled for a disciplinary hearing on her charge of officer assault. The hearing was postponed by Defendant Sergeant Teye due to Ms. Johnson "having a mental health alert." Sergeant Teye reported that he asked Mental Health for advice on whether she was okay to appear before a hearing officer. It is unclear if Mental Health ever responded to Sergeant Teye and if so, what that response was.

96.     On July 7, 2021, Defendant Sergeant Teye proceeded with the disciplinary hearing, despite his concern about Ms. Johnson's capacity in light of her mental health status. Sergeant Teye read Ms. Johnson the charges against her and asked her how she wanted to plead. He reported that in response, Ms. Johnson started talking about things that were not there.

97.     Defendant Sergeant Teye ended the hearing specifically due to Ms. Johnson's "mental health history" and found her guilty based on the officer's report. Despite Sergeant Teye's clear recognition of Ms. Johnson's mental health symptoms, at no point during the disciplinary hearing did he make any attempt to assess whether she had the capacity to understand or participate. When Sergeant Teye asked if Ms. Johnson wanted to appeal, she was unable to answer the question.

98.     Defendant Sergeant Teye stated that he emailed Mental Health about this incident.

99.     Ms. Johnson continued to be held in administrative segregation.

100.    On July 9, 2021, Defendant Laura Hedden, RN, left another note for Defendant Amanda Fisher, MHNP, stating that Ms. Johnson had not been taking her medication. Hedden reported that Ms. Johnson was "uncooperative, disheveled, mute. Paranoid. Insight and judgment limited." Hedden again requested Fisher consider providing medication by injection for Ms. Johnson, and again noted that "[d]ue to the severity of mental illness it is more of a risk for her to go untreated during pregnancy." Hedden noted that she planned to follow up "in a couple of weeks."

101.    On July 13, 2021, Ms. Johnson filled out an "Inmate Request Form," asking to speak with a social worker. Her form was returned, stating that RRJ did not have a social worker to assist her, and that she needed to state what she wanted to speak with the social worker about so they could direct her request.

102.    No action was taken.

103.    On July 13, 2021, Officer Wagner reported that Ms. Johnson was failing to get up and get dressed and was not showering. She was cited with refusing to obey an order.

104.    On July 13, 2021, Defendant Nurse Edward Adusei made a note in Ms. Johnson's chart that she had refused an ICC hearing. This ICC hearing assessed whether to modify her status under two-officer full restraint and administrative segregation.

105.    The ICC officers recommended that Ms. Johnson remain housed in her current status in isolation.

106.    On July 15, 2021, Defendant Amanda Fisher, MHNP entered a treatment plan for Ms. Johnson to receive the Abilify Injectable.[5]

107.    Ms. Johnson does not appear to have been administered this medication.

108.    On July 19, 2021, Ms. Johnson had been scheduled for an OBGYN appointment and prenatal checkup. Ms. Johnson was not informed or aware of where she was going, and expressed that she was not comfortable attending.

109.    She was therefore not taken to her prenatal appointment.

110.    Later that day, Defendant Nurse Laura Hedden and three unnamed staff members reported speaking with Ms. Johnson about the missed appointment and medication. However, Nurse Hedden reported that Ms. Johnson was speaking rapidly, and the content of her speech was grandiose—hallmark symptoms of psychosis.

111.    Despite the fact that both the correctional officers and mental health staff had notice that Ms. Johnson was experiencing symptoms of psychosis, including delusions, disorganized thoughts, grandiose speech, and breaks with reality, there was no evaluation of whether or not Ms. Johnson fully understood the questions she was asked or the nature of the medical appointment. Nor did the medical staff discuss whether Ms. Johnson's mental capacity should be evaluated or take any action to assess or transfer Ms. Johnson to a location better equipped to provide her care, like Western State Hospital.

112.    Instead, medical staff presented Ms. Johnson with a "Medical Refusal Form" and told her to sign it.

113.    On numerous occasions following that missed appointment, Ms. Johnson made requests to officers and over the intercom to see a nurse so that she could get an ultrasound.

---

[5]ABILIFY MAINTENA is an atypical antipsychotic indicated for (1) treatment of schizophrenia in adults and (2) maintenance monotherapy treatment of Bipolar I disorder in adults.

114.    Ms. Johnson's requests were ignored or denied.

115.    Ms. Johnson never received an ultrasound, or any examination by a qualified obstetrician, or even by a licensed doctor. As a result, the health and gestational age of her fetus was never evaluated by any medical professional.

116.    On July 21, 2021, Defendant James Mackie, LCSW, CSAC spoke with Ms. Johnson about returning to the General Population. Ms. Johnson was exhibiting clear signs of psychosis during this interview. Mackie reported that Ms. Johnson was presenting with tangential thinking, loose associations, hypomania, and pressured speech. Ms. Johnson was unable to focus on the conversation about her missed medical appointment and was claiming that she had documentation that she did not need to take any medication by injection.

117.    After this visit, Defendant Mackie noted in Ms. Johnson's chart that she should be seen by the Mental Health staff weekly.

118.    Ms. Johnson did not receive any additional mental health visits or evaluations for the remainder of her time at RRJ.

119.    On or about July 21, 2021, Corporal Katelyn Koscienski ordered Ms. Johnson to relocate to a different cell. Ms. Johnson refused and said she was not comfortable going to a pod.

120.    Corporal Koscienski reported that Ms. Johnson continued talking but she could not understand what Ms. Johnson was trying to tell her. She informed Defendant Sergeant Teye of the incident, and an email about the incident was sent to Sergeant Joseph Risner and Defendant Portia Bennett.

121.    On July 22, 2021, Ms. Johnson was ordered to remain in administrative segregation for failure to obey the order from Corporal Koscienski.

122.    On July 27, 2021, the ICC held another hearing regarding Ms. Johnson's housing status within administrative segregation. During this hearing, Ms. Johnson did not appear to pay attention to the classification inquiry, and instead used the opportunity in front of jail staff to address issues related to her pregnancy snack bag.

123.    The ICC recommendation, based on having spoken to "Mental Health," was for Ms. Johnson to remain in administrative segregation pending a mental health evaluation. The recommendation also noted that Ms. Johnson had been placed on medical isolation.

124.    Despite communications with "Mental Health," there is no indication that the ICC officers made an inquiry as to whether Ms. Johnson had sufficient capacity to understand the nature of the proceedings, or to represent her perspective regarding her relocation.

125.    On July 27, 2021, a Mental Health Directive was issued by Defendant Portia Bennett requiring Mental Health Observation of Ms. Johnson on thirty-minute intervals.

126.    RRJA Officer Defendants regularly failed to check on Ms. Johnson in accordance with this directive.

127.    Even when RRJA Officer Defendants would perform these checks on Ms. Johnson, oftentimes, they would simply open and close the window on her cell door as they passed, but never look into her cell, engage with her, or respond to her requests.

128.    Ms. Johnson was kept in isolation and was not allowed to leave her cell, even to shower.

129.    The cell where Ms. Johnson was detained was filthy. Ms. Johnson had only a thin mattress and blanket on the floor, and had to eat her meals on the floor next to the toilet. Papers and trash were scattered over the floor. *See* Exhibit 1.

130.    Ms. Johnson had scrawled messages all over the walls and the tray slot of her cell. *See* Exhibit 2.

131.    On July 29, 2021, Ms. Johnson submitted a medical request form asking to see Medical. Her request form was marked as received on August 1, 2021.

132.    Ms. Johnson was never seen by medical staff.

133.    During her detention at the Jail, no one at RRJ ever contacted Ms. Johnson's prior medical providers at either Prince George's County Jail or Western State Hospital about her condition. No outside providers were ever brought to see her. No action was taken to address her escalating symptoms, or to consider a transfer to a facility better equipped to meet her medical needs.

134.    RRJ never contacted Ms. Johnson's public defender to alert her to Ms. Johnson's deteriorating condition so that an evaluation of her capacity could be conducted.

135.    None of the Defendants named in this complaint ever requested or conducted any evaluation of Ms. Johnson's capacity.

### G. RRJ's Continued Deliberate Indifference to Ms. Johnson's Mental Health and Pregnancy, Causing her to Give Birth Alone in her Cell

136.    By August 2, 2021, Ms. Johnson was roughly 27 weeks pregnant.

137.    Ms. Johnson's water broke late in the afternoon on August 2, 2021, before dinner service.

138.    Ms. Johnson informed RRJA Officer Defendants, both directly and through the intercom, that her clothes were wet and that her bedding was soaked. She also showed RRJA Officer Defendants her soaked clothes and bedding.

139.    RRJA Officer Defendants ignored Ms. Johnson's requests for assistance.

140.    On the night of August 2, 2021 and into the early morning of August 3, 2021, at least twenty-six correctional officers were on duty.

141.    Nine Administrative Segregation employees, including Defendants Sergeant Paul Wallace, Officer Tony Coles, Officer Patrick O'Connor, Officer Joseph Jackson, and Corporal Patrick Riverson were on duty on the night of August 2 and into the early morning of August 3, 2021.

142.    Seven supervisors, including Defendants Sergeant Diana Gladmon, Sergeant Stephenie Brown, and Sergeant Peter Teye were on duty and supervised Administrative Segregation employees on the night of August 2, 2021 and into the early morning of August 3, 2021.

143.    Ten lieutenants/watch commanders, including Defendants Lieutenants Christopher Candler and Victor Reid, and Major Gregory McRae, were on duty on the night of August 2, 2021 and into early morning August 3, 2021.

144.    According to shift logs, Defendant Officer Joseph Jackson performed fifteen checks on Ms. Johnson's cell at 18:08, 18:35, 19:06, 19:34, 19:59, 20:42, 21:04, 21:42, 22:09 (at which time Officer Joseph Jackson allegedly provided Ms. Johnson a pregnancy snack bag), 22:41, 23:12, 23:47 PM, 00:13, 00:42, and 01:41 AM.

145.    According to shift logs, Defendant Officer Patrick O'Connor performed a check on Ms. Johnson's cell at 01:15 AM.

146.    In the early morning hours of August 3, 2021, around 02:00 AM, Ms. Johnson began experiencing severe pain and went into active labor.

147.    During labor, Ms. Johnson repeatedly screamed for help, but received no attention or response from any one of the correctional officers on duty.

148.    Ms. Johnson was terrified for herself and for her infant child.

149.    Ms. Johnson delivered her child by herself alone in her cell.

150.    At the time of delivery, Ms. Johnson's newborn child was alive and moving and looked up at Ms. Johnson. Ms. Johnson repeatedly called for help through her cell door and over the intercom system after the birth of her son.

151.    Based on Ms. Johnson's previous experience using the intercom, nothing about the intercom button gave the impression that it was not working.

152.    None of the correctional officers on duty responded to Ms. Johnson's pleas for aid.

153.    According to shift logs, Defendant Officer Joseph Jackson performed five checks, in addition to his previous fifteen checks, on Ms. Johnson's cell at 02:39, 04:04, 04:36, 05:18 (at which point Officer Jackson allegedly served Ms. Johnson breakfast), and 05:31 AM.

154.    According to shift logs, Defendant Officer Patrick O'Connor performed two checks on Ms. Johnson's cell at 03:09 and 03:28 AM.

155.    According to shift logs, Defendant Officer Tony Coles performed a check on Ms. Johnson's cell at 05:57 AM.

156.    According to shift logs, Defendant Corporal Paul Wallace performed two checks on Ms. Johnson's cell at 06:33 and 06:57 AM.

157.    Despite the ten alleged checks on Ms. Johnson, performed by four different officers between 02:00 and 07:00 AM, Ms. Johnson remained alone in her cell with her premature newborn child, for at least five hours without any medical assistance.

158.    Throughout the hours that officers allegedly performed these checks, Ms. Johnson continued to request emergency medical attention.

159.     Despite her pleas for help, she received no response. At some point, she stopped pressing the button because she had lost hope and believed that none of the officers on duty, including the four officers that performed checks on her, were coming to help.

160.     According to shift logs, Defendant Corporal Paul Wallace performed a check on Ms. Johnson's cell at 07:09 AM on the morning of August 3, 2021. Defendant Corporal Paul Wallace reportedly found Ms. Johnson and her newborn. He then called a "Code Blue," alerting RRJ staff to a medical emergency.

161.     Ms. Johnson believed that her infant child was still alive at this time.

162.     Medical staff responding to the call noted Ms. Johnson was dressed only in a bra and underwear.

163.     Defendant Corporal Paul Wallace saw blood all over Ms. Johnson's blanket and bedding, and Nurse Defendant Helena Sangoe reported that there was blood all over the floor.

164.     Defendant Lieutenant Christopher Candler arrived shortly thereafter and also called for medical assistance.

165.     Medical staff, including Nurse Defendants Barbara Meade and Helena Sangoe, and Nurse Sampson Otoo, then arrived at Ms. Johnson's cell and attempted to render medical aid to Baby Boy Johnson. The nurses attempted CPR on the infant but were unsuccessful.

166.     Corporal Reid and Austin Stoy then forcibly separated Ms. Johnson from her child.

167.     Ms. Johnson never saw her child again.

168.     Corporals Reid and Dallek handcuffed Ms. Johnson and locked her in a different cell.

169.    Corporal Reid reported that Ms. Johnson talked to someone about the baby on a nonexistent phone and Defendant Lieutenant Candler reported that Ms. Johnson seemed to be in an altered mental state when he arrived.

170.    Ms. Johnson was not given any medical assistance by the RRJ medical staff.

171.    A staff member called 911 and a Rescue Squad was sent to the Jail, arriving around 07:30 AM.

172.    Ms. Johnson and Baby Boy Johnson were then separately transported from RRJ in rescue vehicles to Mary Washington Hospital, also called Stafford Hospital.

173.    The doctors at Stafford Hospital officially pronounced Baby Boy Johnson deceased.

174.    Due to the deliberate indifference of all Defendants to Ms. Johnson's mental health needs since her arrival at the Jail and the trauma of delivering a baby alone in her cell, Ms. Johnson suffered an acute mental health crisis.

175.    Ms. Johnson was treated at Stafford Hospital. Dr. Rachel McCarter noted that Ms. Johnson was undergoing an active psychotic break when she was brought to the hospital.

176.    Ms. Johnson was restrained and forcibly administered the antipsychotic medication, Haldol. Ms. Johnson was also treated for vaginal bleeding and prescribed Pitocin to assist in postpartum recovery. She also had anemia from childbirth.

**H. Autopsy**

177.    Baby Boy Johnson's body was sent to the Office of the Chief Medical Examiner for the Commonwealth of Virginia for an autopsy.

178.    The autopsy revealed a well-developed male child, approximately 27 weeks old.

179.    There was no evidence of prolonged intrauterine fetal death.

180.    The autopsy revealed evidence that the infant was born alive, including a gastric air bubble, although the findings were discordant.

181.    The cause of death was determined to be due to a significant placenta/umbilical cord infection, known as "acute chorioamnionitis and funisitis," which can result in premature delivery and death.

182.    The National Institute of Health describes the condition as follows:[6]

a.   Chorioamnionitis is a common infection of pregnancy, typically occurring in the setting of prolonged membrane rupture or labor.

b.   Chorioamnionitis is associated with postpartum maternal infections and potentially devastating fetal complications including premature birth, neonatal sepsis and cerebral palsy.

c.   Chorioamnionitis can be diagnosed due to maternal fever and maternal and fetal tachycardia.

d.   The main preventative strategy is administration of antibiotics to women with preterm premature rupture of membranes, which reduces the incidence of clinical chorioamnionitis, prolongs the time to delivery, and improves neonatal outcomes.

e.   Evidence from randomized trials and observational studies show that immediate intrapartum use of broad-spectrum antibiotics significantly reduces maternal and fetal complications of chorioamnionitis. The frequency of neonatal sepsis is reduced by up to 80% with intrapartum antibiotic treatment. The standard regimen effectively treats maternal infection (>95% success rate).

**I.   Ms. Johnson is Sent to Western State Hospital**

---

[6]https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3008318/#:~:text=Definition,the%20setting%20of%20membrane%20rupture.

183.    Ms. Johnson was then taken to Western State Hospital, a mental health hospital in Staunton, Virginia. Western State Hospital is part of the Virginia Department of Behavioral Health and Development Services.

184.    None of Ms. Johnson's belongings from her cell, including grievance forms, were ever returned to her.

185.    Ms. Johnson remained at Western State Hospital for over four months.

186.    During her time at Western State Hospital, Ms. Johnson was given antipsychotic medication.

187.    The medical team at Western State noted that Ms. Johnson's psychosis was exacerbated by her traumatic experience giving birth alone and the death of her infant child.

188.    The medical team at Western State Hospital reported that Ms. Johnson was deeply grieving over the death of her infant child and that Ms. Johnson was consistently meeting with her chaplain and her medical team to assist her in that grieving process.

189.    Ms. Johnson wanted to name her child Tozart N. Estes, but the deceased infant child was never issued a birth certificate and she was never allowed to officially name him. Ms. Johnson was never given the opportunity to have a funeral for her child.

190.    At no point during her stay at Western State Hospital did Ms. Johnson have access to RRJ's grievance procedure.

191.    After several months at Western State Hospital, Ms. Johnson underwent a competency test to be deemed fit to stand trial.

192.    Ms. Johnson passed her competency test and was sent to Prince William – Manassas Regional Adult Detention Center until October 21, 2021.

193.    As of the date of this filing, Ms. Johnson is no longer incarcerated and currently lives independently following her completion of a residential treatment program for her mental health.

J.  **RRJA's Pattern of Deliberate Indifference**

194.    RRJA has a pattern and practice of denying or delaying the provision of medical care to individuals in its custody, particularly the provision of mental health care.

195.    RRJA has a pattern and practice of placing individuals in isolation or administrative segregation rather than addressing their medical needs.

196.    RRJA has a pattern of allowing nurse practitioners to exceed the scope of their duties and failing to provide individuals in its custody access to physicians, psychiatrists, or other licensed professionals.

197.    In recent litigation in this district, people detained at the Jail have alleged the following:

a.  RRJ ignored multiple medical request forms from an individual reporting severe headaches who subsequently had a stroke and died. The individual alleged that the nurses were exceeding the scope of their practice/licensure by making final medical decisions to deny care, rather than scheduling follow up appointments with a physician.[7]

b.  An individual made medical staff at RRJ aware of mental health issues including severe depression, PTSD, and past suicide attempts but the medical staff failed to

---

[7] *Shanks v. Rappahannock Regional Jail Authority*, 23-cv-00039

provide access to mental health professional for months at a time and failed to answer medical request forms for up to three months.[8]

c. An individual was not provided his prescribed medication for anxiety and PTSD between February and July, and his medical request forms went three months without a response.[9]

d. An individual was prescribed psychiatric medications prior to detention and was detained for over a month without receiving his medication. Further, the individual's medical request forms were completely denied.[10]

e. An individual was denied treatment and medical attention for a chronic disease by the medical staff at RRJ, in particular Barbara Meade.[11]

f. An individual hit his head, lost consciousness and was disoriented. Medical staff at RRJ placed him in isolation rather than providing actual medical treatment and continues to deny inmate medical requests for additional treatment.[12]

g. An individual with avascular necrosis has been denied injections, pain mediation, x-rays and MRI that he was prescribed before arriving at RRJ. [13]

h. An individual was denied a request for a wheelchair or walker from the medical staff at RRJ after suffering a back and hip injury. The individual could not walk and urinated on himself in his cell and was then at first denied a shower by correctional officers. RRJ continues to ignore medical request forms filed by him.[14]

---

[8] *Kimbrough v. Kevin Hudson*, 22-cv-0060
[9] *Bartlett v. Rappahannock Regional Jail*, 21-cv-862
[10] *Weyant v. Rappahannock Regional Jail*, 21-cv-141
[11] *Vann v. Rappahannock Regional Jail, et al.*, 17-cv-274
[12] *Conway v. Superintendent, Rappahannock Regional Jail*, 19-cv-280
[13] *Wearen v. Rappahannock Regional Jail*, 19-cv-43
[14] *Pettus v. Rappahannock Regional Jail, et a.l*, 18-cv-1201

i.  An individual has been requesting medication for auto-immune illness and has been repeatedly denied and mocked by RRJ medical staff and officers.[15]

j.  An individual was prescribed medications at a prior detention facility but was refused a medical appointment at RRJ when his medications ran out. The individual requested a doctor's appointment, but was never actually evaluated, and had to wait multiple months to have a subsequent medical appointment and receive treatment.[16]

k.  An individual was not given his prescribed medications when he arrived at RRJ. The individual had a doctor's appointment scheduled to which he was never taken. He alleges that multiple medical request forms were turned down and not responded to, and that it took over five months to get medication for mental health issues.[17]

l.  An individual was denied medication described for bipolar disorder and told they needed no medication.[18]

## V.  CLAIMS FOR RELIEF

### Claim I: Fourteenth Amendment Violation
U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983
*Against all Defendants, except Kevin Hudson*

198.  Ms. Johnson adopts and incorporates paragraphs 1 through 197 above as if fully set forth herein.

199.  Ms. Johnson is a citizen of the United States and all Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

---

[15] *Love-Robinson, PhD v. Grimes, et al.*, 16-cv-669
[16] *Rose v. Grimes*, 16-cv-620
[17] *Brown v. Stevenson*, 16-cv-723
[18] *Jones v. Meade, et al.*, 16-cv-164

200.     Ms. Johnson has a clearly established right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from deprivations of her life and liberty without due process of law.

201.     Ms. Johnson had not yet been convicted of the crime with which she had been charged.

202.     As a pretrial detainee housed at RRJ, Ms. Johnson had a right under the Fourteenth Amendment to receive constitutionally adequate medical care for her objectively serious medical needs.

203.     As a pretrial detainee housed at the Jail, Ms. Johnson had an established liberty interest in being free from punitive conditions without procedural due process, including the right to a hearing regarding disciplinary actions taken against her, and the right to present her views for any non-punitive restrictions against her.

204.     Ms. Johnson was diagnosed with Schizoaffective Disorder, an objectively serious medical need which required ongoing treatment and medication.

205.     Ms. Johnson was also diagnosed as pregnant while at RRJ pursuant to the Jail's own administered pregnancy test, making RRJA Officer Defendants and named medical Defendants, aware of the obvious and necessary intervention of medical services to support her pregnancy. Defendants were subjectively aware of the risk and seriousness of Ms. Johnson's mental health condition, due to their own medical and correctional records, and due to the observations of correctional officers between May and August 2021.

206.     Defendants were also subjectively aware of the need to closely monitor Ms. Johnson's physical and mental health, as demonstrated by the medical directives requiring weekly, and then thirty-minute recurring mental health checks.

207.    Defendants were aware that Ms. Johnson was pregnant, that she suffered from Schizoaffective Disorder, and that during her prior incarceration at RRJ her symptoms worsened significantly and rapidly enough that they needed to transfer her to a medical correctional facility. Defendants were further aware of her mental health condition, her risk of suicide, and her need for consistent monitoring, all facts which made Defendants aware of the substantial risk of harm both for Ms. Johnson and her unborn child if she was left untreated.

208.    Named medical Defendants were explicitly aware of this risk, as it was written in Ms. Johnson's medical file that due to the severity of her mental illness it was "a risk to the health of the pregnancy to be untreated."

209.    Defendants' own statements make clear that they were aware and believed that there was a substantial risk of harm to Ms. Johnson and her baby if left unmedicated and with such diminished capacity.

210.    Defendants routinely failed to properly follow their own medical and safety directives and policies related to Ms. Johnson, put in place to mitigate the risks Defendants displayed subjective awareness of.

211.    Defendants' acts and omissions amounted to deliberate indifference to Ms. Johnson's objectively serious mental health and pregnancy needs.

212.    At the time Defendant Hearing Officers initiated institutional disciplinary proceedings against Ms. Johnson, they were aware that she lacked the requisite capacity to be properly granted her procedural right to a hearing, and yet Defendants continued with the hearing in spite of this fact. These proceedings, the disciplinary segregation following them, and the subsequent decisions to continue Ms. Johnson's administrative segregation, represented a deprivation of Ms. Johnson's liberty interest without the process she was owed.

213.    As a direct and proximate cause of Defendants' failure to address Ms. Johnson's serious medical needs, as set forth *supra*, Ms. Johnson was left virtually ignored in her cell, was not medicated appropriately, was not provided with a prenatal examination, and was not transferred to a facility equipped to provide her adequate medical care.

214.    This lack of proper treatment allowed Ms. Johnson's mental health condition to worsen, directly impacting her ability to make decisions and act in her own and her unborn child's best interest. Defendants never assessed Ms. Johnson's capacity to make informed decisions.

215.    Furthermore, when Ms. Johnson went into labor and gave birth, that constituted an objectively serious medical need, which any lay person would have recognized as creating an obvious need for medical intervention on her behalf.

216.    Baby Boy Johnson's premature birth constituted an objectively serious medical need on behalf of Baby Boy Johnson.

217.    At the time Ms. Johnson went into premature labor, she was subject to the Mental Health Directive issued by Portia Bennett requiring Mental Health Observation on thirty-minute intervals, however she remained alone in her cell and unable to access assistance for the duration of the night.

218.    Defendants Officer Joseph Jackson, Officer Patrick O'Connor, Corporal Paul Wallace and Officer Tony Coles all alleged that they complied with the mental health directive and completed security checks on Ms. Johnson's cell during the period of time in which she labored and delivered her infant son, and during the more than five hours she spent in her cell with him, still attached to the umbilical cord.

219.    Notwithstanding that knowledge, Defendants exhibited deliberate indifference to Ms. Johnson's objectively serious medical need in failing to provide any medical assistance to her

in the time between her water breaking in the afternoon, her going into labor and giving birth at 02:00 AM, and her and the child being identified at 07:00 AM. Defendants' delay in providing timely medical care during her premature labor resulted in substantial physical and emotional harm to both Ms. Johnson and Baby Boy Johnson, who was born alive but died in the five hours prior to the provision of any medical attention by RRJ staff.

220.    Defendants were aware of the need to provide regular monitoring of Ms. Johnson's cell and that there was a substantial risk of harm to her if not regularly monitored due to her condition.

221.    Ms. Johnson requested the Officers' assistance, repeatedly screamed for help and utilized the emergency button in her cell, making the Defendants aware of the substantial risk of harm to her, however, Defendants exhibited deliberate indifference in failing to investigate Ms. Johnson's cell and secure medical attention for her.

222.    Defendants' failure to respond to Ms. Johnson's requests for aid caused her to endure labor and delivery alone in a cell.

223.    RRJA Officer Defendants' treatment of Ms. Johnson caused her and her newborn to remain without medical assistance for hours.

224.    Ms. Johnson experienced extreme pain and suffering during delivery and while waiting for assistance in her cell.

225.    Ms. Johnson experienced severe emotional trauma due to giving birth alone in her cell, and due to the death of her infant child.

226.    The behavior of the Defendants is so egregious and outrageous that it may fairly be said to shock the contemporary conscience.

227.    The aforementioned behavior cannot be said to serve any penological interest or to operate neutrally.

228.    In overseeing, administering, executing, and enforcing the laws of the state of Virginia and its municipal corporations, Defendants act under the color of state law.

229.    By virtue of their respective contracts with RRJA, RCHC and RACSB and their employees and agents acted under the color of state law in performing their medical duties at the jail.

230.    Defendants have a duty to provide medical care and reasonable safety to people in the state's custody.

231.    That the actions and omissions of all Defendants under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, were all performed under the color of state law and were unreasonable and performed knowingly, intentionally, maliciously, and with deliberate indifference to Ms. Johnson and her infant child's safety, well-being and serious medical needs; with wanton intent for Ms. Johnson and Baby Boy Johnson to suffer an unnecessary intentional infliction of pain and suffering by failing to obtain medical treatment, by reason of which Plaintiffs are entitled to compensatory and/or punitive damages.

### Claim II: Supervisory Liability

U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983
*Against Defendant Kevin Hudson*

232.    Ms. Johnson adopts and incorporates paragraphs 1 through 231 above as if fully set forth herein.

233.    Defendant Kevin Hudson, as Superintendent, had actual or constructive knowledge that RRJA employees had policies, practices, or customs of putting individuals in the custody of

RRJ with mental health issues in isolation rather than providing treatment, of only providing individuals access to care from nurse practitioners rather than from licensed physicians or psychiatrists, of making decisions concerning the need for appropriate medical treatment for individuals despite lacking appropriate medical training, of abusing discretion to decline responses to medical requests, of delaying the provision of medical care to individuals, and of failing to conduct meaningful security/mental health checks.

234.    The above policies, practices, or customs created a pervasive and unreasonable risk of constitutional injury to individuals within the custody of RRJ, including Ms. Johnson due to her ongoing pregnancy and mental health condition during her time at RRJ.

235.    Despite Defendant Kevin Hudson, as Superintendent, possessing knowledge of the ongoing risks to individuals within the custody of RRJ, he failed to take action to stop or prevent any of the above ongoing policies, practices, or customs. Additionally, Defendant Kevin Hudson failed to develop and implement appropriate policies and procedures to ensure proper instruction, training, and supervision of his subordinates.

236.    Defendant Superintendent Kevin Hudson's failure to address these constitutionally inadequate procedures amounts to deliberate indifference and tacit authorization of those practices. If not for Defendant Kevin Hudson's failure to address these constitutionally inadequate policies, practices, customs, and/or procedures, the injuries suffered by Ms. Johnson and Baby Boy Johnson, including the death of Baby Boy Johnson would not have occurred.

**Claim III: Monell Liability**

U.S. Const. Amend. XIV, § 1; 42 U.S.C. § 1983
*Against Defendants RRJA, RCHC, and RACSB*

A.   **Failure to Train and Adequately Supervise**

237.  Plaintiff adopts and incorporates paragraphs 1 through 236 above as if fully set forth herein.

238.  That the Defendants failed to adequately train officers, correctional employees, and medical staff at all times material to this Complaint on how to care for persons in their custody suffering from serious mental health conditions, how to determine when an individual needs to be transferred to a facility better-equipped for their psychiatric care, how to identify individuals in their custody in need of immediate medical attention, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds or mental health checks on special needs individuals, and how to evaluate misbehavior and discipline individuals undergoing mental health crises, amongst other failures.

239.  That Defendants' failure to adequately train and supervise their officers, correctional employees, and medical staff on how to care for persons in their custody suffering from serious mental health conditions, and individuals in their custody in need of immediate medical attention, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct security rounds or mental health checks on special needs individuals, demonstrated a deliberate indifference on the part of Defendants as to whether the failure to adequately train and supervise their correctional employees would result in the violation of the constitutional, civil, and statutory rights of individuals in their custody, such as Ms. Johnson and Baby Boy Johnson.

240.  That the above-mentioned failure to adequately train and supervise correctional and medical staff was a direct and proximate cause of the violations of the constitutional, civil, and statutory rights of Ms. Johnson and Baby Boy Johnson.

241.    That the above-mentioned failure to adequately train and supervise correctional and medical staff was a direct and proximate cause of Baby Boy Johnson's death, and the injuries and damages suffered by both Ms. Johnson and Baby Boy Johnson.

**B.   Policies, practices, and customs of denying or delaying the provision of medical care to individuals within the custody of RRJ, particularly the provision of mental health care**

242.    Ms. Johnson adopts and incorporates paragraphs 1 through 241 above as if fully set forth herein.

243.    That Defendants have a policy, practice, and/or custom of denying or delaying the provision of medical care to individuals within the custody of RRJ, particularly the provision of mental health care.

244.    That the actions of the Defendants of routinely allowing correctional and medical staff to ignore inmate medical request forms, of allowing correctional and medical staff to delay responding to medical request forms, and of allowing individuals suffering severe mental health conditions to remain unmedicated for significant periods of time, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

245.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

246.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's constitutional, civil, and statutory rights, which led to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

247. That the above-mentioned policies, practices, and/or customs were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

**C.** **Policies, practices, and customs of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment**

248. Plaintiff adopts and incorporates paragraphs 1 through 247 above as if fully set forth herein.

249. That Defendants have a policy, practice, and/or custom of allowing untrained correctional staff to make decisions concerning the need for appropriate medical treatment.

250. That the actions of the Defendants of allowing correctional officers the discretion to ignore individuals' written or verbal requests for medical assistance, and allowing correctional officers to determine whether individuals need medical care, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

251. That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

252. That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's constitutional, civil, and statutory rights, which led to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

253. That the above-mentioned policies, practices, and/or customs were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

**D.  Policies, practices, and customs of allowing nurse practitioners to exceed the scope of their duties, and failing to provide individuals within the custody of RRJ access to physicians or other licensed professionals**

254.    Ms. Johnson adopts and incorporates paragraphs 1 through 253 above as if fully set forth herein.

255.    That Defendants have a policy, practice, and/or custom of only providing individuals within the custody of RRJ access to care from nurse practitioners, rather than from licensed physicians or psychiatrists.

256.    That the actions of the Defendants of only providing individuals access to care from nurse practitioners, rather than from licensed physicians or psychiatrists, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

257.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

258.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's constitutional, civil, and statutory rights, which led to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

259.    That the above-mentioned policies, practices, and/or customs were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

E. **Policies, practices, and customs of placing individuals within the custody of RRJ in isolation or administrative segregation rather than addressing their medical needs**

260.    Plaintiff adopts and incorporates paragraphs 1 through 259 above as if fully set forth herein.

261.    That Defendants have a policy, practice, and/or custom of placing individuals exhibiting mental health symptoms in isolation or administrative segregation, rather than taking action to address that individual's medical needs, and of disciplining rather than treating individuals for their mental health symptoms.

262.    That the actions of the Defendants of placing individuals exhibiting mental health symptoms in isolation or administrative segregation, rather than taking action to address that individual's medical needs, and of disciplining rather than treating individuals for mental health symptoms, were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

263.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies, practices, and/or customs would change.

264.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's constitutional, civil, and statutory rights, which led to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

265.    That the above-mentioned policies, practices, and/or customs were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

**F.** **Policies, practices, and customs of not conducting security rounds and/or mental health checks in a timely or meaningful manner**

266.    Ms. Johnson adopts and incorporates paragraphs 1 through 265 above as if fully set forth herein.

267.    That Defendants have a policy, practice, and/or custom of not conducting security rounds and/or mental health checks in a timely or meaningful manner.

268.    That the actions of the Defendants of allowing correctional officers to skip security rounds and/or mental health checks, not perform security rounds and/or mental health checks, and/or not perform meaningful security rounds and/or mental health checks were done in accordance with Defendants' policies, practices, and/or customs condoning the use of said procedures. That this policy, practice, and/or custom was officially adopted.

269.    That the Defendants had actual and/or constructive knowledge of each and every one of the above-mentioned policies, practices, and/or customs and were deliberately indifferent as to whether said policies would change.

270.    That each and every one of the above-mentioned policies, practices, and/or customs was a direct and proximate cause of the violations of Ms. Johnson and Baby Boy Johnson's constitutional, civil, and statutory rights, which led to the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

271.    That the above-mentioned policies, practices, and/or customs were a direct and proximate cause of the injuries and damages suffered by Ms. Johnson and Baby Boy Johnson, as well as the eventual death of Baby Boy Johnson.

**Claim IV: Violation of the Americans with Disabilities Act**
42 U.S.C. § 12101, et seq.
*Against Defendants RRJA, RCHC, RACSB, RRJA Medical Defendants, RRJA Hearing Officers,*
*Barbara Meade, RRJA Officer Defendants & RACSB Mental Health Defendants*

272.    Ms. Johnson adopts and incorporates paragraphs 1 through 271 above as if fully set forth herein.

273.    Ms. Johnson states this cause of action against Defendants in their official capacities.

274.    Prior to her incarceration at RRJ, Ms. Johnson was diagnosed with Schizoaffective Disorder, a disease characterized by delusions (false beliefs), hallucinations (seeing or hearing things that don't exist), unusual physical behavior, and disorganized thinking or speech when left untreated.[19]

275.    Ms. Johnson's symptoms of delusions, hallucinations and disorganized thinking or speech, which would otherwise substantially limit her major life activities, can be entirely ameliorated through a combination of medication and mental health services.

276.    Ms. Johnson is a qualified individual with a disability as defined in 42 U.S.C. §12131(2).

277.    Ms. Johnson is entitled not to be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity, on the basis of disability. See 42 U.S.C. § 12132.

278.    RRJ is a public entity as defined by 42 U.S.C. § 12131(1)(B).

279.    Defendants were aware of Ms. Johnson's disability based on her medical records, which indicated that she had schizoaffective disorder, and her Classification Interview, which

---

[19] *See* Schizophrenia, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services, available at https://www.samhsa.gov/mental-health/schizophrenia.

identified that she had a "psychological impairment," and "medical problem." Defendant Officer Barlow expressly noted in his report that "Ms. Johnson is an ADA inmate." RRJA Officer Defendants and named medical Defendants were aware of Ms. Johnson's pregnancy, having administered a pregnancy test on June 21, 2021.

280.    RRJA Officer Defendants and named medical Defendants discriminated against Ms. Johnson on the basis of her disability by repeatedly denying Ms. Johnson's virtually daily written and oral requests for adequate medical care.

281.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by denying her equal access to basic hygienic needs such as regular showers.

282.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by denying her equal access to the paperwork necessary to formally request medical and mental health services.

283.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by refusing her oral requests to see a nurse and harassing and humiliating her when she attempted to advocate for her medical needs.

284.    Defendant Hearing Officers discriminated against Ms. Johnson on the basis of her disability by proceeding with disciplinary hearings against Ms. Johnson when she was obviously not competent to proceed and initiating punishments, which included the denial of basic benefits to prisoners and expanded time in administrative segregation, due to or in spite of her inability to participate in the proceedings against her.

285.    Defendant Hearing Officers discriminated against Ms. Johnson on the basis of her disability by proceeding with disciplinary hearings against Ms. Johnson for failure to comply

violations that were clearly the result of Ms. Johnson's mental health condition and not any willful violation of genuine officer directives.

286.    Defendants' discrimination contributed to the deterioration of Ms. Johnson's mental health condition by causing Ms. Johnson to be isolated and largely ignored in administrative segregation for the duration of her incarceration at RRJ.

287.    Defendants' discrimination and the punishment of extended isolation in administrative segregation they imposed on Ms. Johnson on the basis of her disability, caused Ms. Johnson to be completely alone and unable to access assistance when she went into labor on the night of August 2, 2021.

288.    The actions undertaken by Defendants constitute discrimination on the basis of disability that prevented Ms. Johnson from equally accessing medical and public services.

### Claim V: Violation of the Rehabilitation Act
29 U.S.C. § 794(a)
*Against Defendants RRJA, RCHC, RACSB, RRJA Medical Defendants, RRJA Hearing Officers, RRJA Officer Defendants, Barbara Meade & RACSB Mental Health Defendants*

289.    Ms. Johnson adopts and incorporates paragraphs 1 through 288 above as if fully set forth herein.

290.    Ms. Johnson states this cause of action against Defendants in their official capacities.

291.    Ms. Johnson suffers from Schizoaffective Disorder.

292.    Ms. Johnson is a qualified individual as defined by 29 U.S.C. § 705(20).

293.    Ms. Johnson is entitled not to be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any executive agency or by the United States Postal Service solely by reason of her disability. 29 U.S.C. § 794(a).

294.    Defendant RRJA is an entity of the Commonwealth of Virginia to which federal financial assistance is extended. *See* 29 U.S.C. § 794(b)(1)(B).

295.    Defendant RACSB receives federal financial assistance.

296.    RRJA Officer Defendants and named medical Defendants were aware of Ms. Johnson's pregnancy, having administered a pregnancy test on June 21, 2021.

297.    RRJA Officer Defendants and named medical Defendants discriminated against Ms. Johnson on the basis of her disability by repeatedly denying Ms. Johnson's virtually-daily written and oral requests for adequate medical care.

298.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by denying her equal access to basic hygienic needs such as regular showers.

299.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by denying her equal access to the paperwork necessary to formally request medical and mental health services.

300.    RRJA Officer Defendants discriminated against Ms. Johnson on the basis of her disability by refusing her oral requests to see a nurse and harassing and humiliating her when she attempted to advocate for her medical needs.

301.    Defendant Hearing Officers discriminated against Ms. Johnson on the basis of her disability by proceeding with disciplinary hearings against Ms. Johnson when she was obviously not competent to proceed.

302.    Defendant Hearing Officers discriminated against Ms. Johnson on the basis of her disability by initiating punishments, which included the denial of basic benefits to prisoners and expanded time in administrative segregation, due to or in spite of her inability to participate in the proceedings against her.

303.    Defendant Hearing Officers discriminated against Ms. Johnson on the basis of her disability by proceeding with disciplinary hearings against Ms. Johnson for a failure to comply violations that were clearly the result of Ms. Johnson's mental health condition and not any willful violation of a genuine directive from officers.

304.    Defendants' discrimination contributed to the worsening of Ms. Johnson's mental health condition.

305.    Defendants' discrimination caused Ms. Johnson to be isolated and largely ignored in administrative segregation for the duration of her incarceration at RRJ.

306.    Defendants' discrimination, and the punishment of extended isolation in administrative segregation they imposed on Ms. Johnson on the basis of her disability, caused Ms. Johnson to be completely alone and unable to access assistance when she went into labor on the night of August 2, 2021.

307.    The actions undertaken by Defendants constitute discrimination on the basis of disability that prevented Ms. Johnson from equally accessing medical and public services.

### Claim VI: Violation of the Patient Protection and Affordable Care Act
42 U.S.C.A. § 18116
*Against Defendants RRJA, RCHC, RACSB, RRJA Medical Defendants, RRJA Officer Defendants, Barbara Meade, & RACSB Mental Health Defendants*

308.    Ms. Johnson adopts and incorporates paragraphs 1 through 307 above as if fully set forth herein.

309.    Ms. Johnson has a clearly established right under the Patient Protection and Affordable Care Act ("PPACA") to not be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving federal financial assistance, on the basis of her disabilities.

54

310.    Ms. Johnson suffers from Schizoaffective Disorder and is a qualified individual as defined by 29 U.S.C. § 705(20).

311.    Defendants RRJA, RCHC, and/or RACSB receive federal financial assistance for health programs.

312.    RCHC and Defendant Peter Ober denied Ms. Johnson health care on the basis of her disability by failing to provide her access to appropriate prenatal care, including access to qualified medical professionals, routine physical examinations, and screening and diagnostic tests, including an ultrasound during her first trimester, bloodwork and testing, and fetal heart rate and other monitoring.

313.    RACSB Mental Health Defendants denied Ms. Johnson health care on the basis of her disability by failing to properly provide Ms. Johnson appropriate medication to treat her mental health symptoms, failing to provide Ms. Johnson access to mental health professionals who could better address her worsening mental health condition, and failing to seek other treatment options or transfer when it became clear that Ms. Johnson's mental health condition was significantly worsening.

### Claim VII: Wrongful Death
Va. Code §§ 8.01-50
*Against Defendants RRJA, RCHC, RACSB, Peter Ober, RRJA Officer Defendants, RRJA Medical Defendants & RACSB Mental Health Defendants*

314.    Ms. Johnson adopts and incorporates paragraphs 1 through 313 above as if fully set forth herein.

315.    Ms. Johnson's child has the right to bring an action for death by wrongful act because Ms. Johnson's child died as a result of Defendants' gross negligence.  *See* Va. Code Ann. § 8.01-50 (A).

316.    Ms. Johnson is the personal representative of Baby Boy Johnson.

317.    Ms. Johnson may bring an action for death by wrongful act on behalf of her child. *See* Va. Code Ann. § 8.01-50 (C).

318.    Virginia law imposes a duty of care on medical staff and personnel to protect the health and safety of persons in their care.

319.    At all times relevant herein, Defendants had an affirmative duty to provide Plaintiffs Ms. Johnson and Baby Boy Johnson with appropriate medical care and humane and appropriate treatment in a manner consistent with Virginia law and the prevailing standards of care.

320.    The acts and omissions herein constitute violations of the standards of care with respect to Baby Boy Johnson by persons licensed by the Commonwealth of Virginia to provide healthcare as physicians and nurses.

321.    The RACSB Mental Health Defendants breached their duties of care when they failed to adequately treat Ms. Johnson's mental health conditions.

322.    According to the National Commission on Correctional Health Care, correctional facilities have a duty to provide appropriate prenatal care, including medical examinations by a provider qualified to provide prenatal care and prenatal laboratory and diagnostic tests in accordance with national guidelines.

323.    RRJA Medical Defendants and Peter Ober breached their duty of care by failing to provide Ms. Johnson with adequate prenatal care, including any medical examination by a provider qualified to provide prenatal care.

324.   RRJA Medical Defendants and Peter Ober breached their duty of care by failing to provide Ms. Johnson with adequate prenatal laboratory and diagnostic tests, including the first trimester ultrasound or any bloodwork or fetal heart rate monitoring.

325.   The Virginia Department of Corrections mandates twenty-four-hour emergency medical services be available in its facilities, and complaints be handled immediately. VDOC OP 720, IIB.

326.   RRJA Officer Defendants on duty the night of August 2, 2021, into the early morning of August 3, 2021, also breached their duty of care by failing to respond to Ms. Johnson's pleas for medical assistance, both verbally into the hallway and through the emergency system installed in her cell.

327.   RRJA Officer Defendants on duty the night of August 2, 2021, into the early morning of August 3, 2021, breached their duty of care by failing to appropriately follow the directives of mental health care professionals, who established that Ms. Johnson needed to be checked on in thirty-minute intervals to ensure her continued wellbeing.

328.   RRJA Officer Defendants on duty the night of August 2, 2021, into the early morning of August 3, 2021, breached their duty of care by failing to provide assistance to Ms. Johnson during a clear medical emergency, the premature birth of Baby Boy Johnson.

329.   As a direct and proximate result of Defendants' actions, Ms. Johnson gave birth two months early, unaided and alone, in her cell.

330.   As a direct and proximate result of the actions of Defendants, Baby Boy Johnson was denied the life-saving medical treatment he needed for at least five hours.

331.   As a direct and proximate result of the actions of Defendants, Baby Boy Johnson was not diagnosed with and treated for chorioamnionitis.

332.     As a direct and proximate result of the actions of Defendants, Baby Boy Johnson died where he was born, in a prison cell at RRJ, of an eminently treatable infection.

## VI.     DAMAGES

Plaintiff, Ms. Johnson, has suffered the following injuries for which she seeks full compensation under the law:

1.     Widespread physical injuries, and the death of her child, resulting from untreated medical conditions while in Defendants' custody;

2.     Pain and suffering;

3.     Mental and emotional distress.

Plaintiff, Estate of Baby Boy Johnson, suffered the following injury for which Ms. Johnson seeks full compensation under the law.

4.     Death.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully asks the Court:

(a) DECLARE that Defendants' conduct violated the Fourteenth Amendment to the United States Constitution; the Americans with Disabilities Act; the Rehabilitation Act; the Patient Protection and Affordable Care Act; and Virginia common law through the tort of Medical Malpractice resulting in Wrongful Death.

(b) ENTER JUDGMENT holding the appropriate Defendants jointly and severally liable to plaintiff for compensatory damages, punitive damages, and other damages recoverable under the laws of the Commonwealth of Virginia;

(c) AWARD compensatory and punitive damages in an amount to be determined by a jury;

(d) AWARD Plaintiff her costs and reasonable attorney's fees;[20] and

(e) GRANT such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

Dated: November 16, 2023

<table>
<tr><td>Ashlei Anderson, Student Attorney[21]<br>Serena Dineshkumar, Student Attorney<br>Josh Galst, Student Attorney<br>Amanda Maze-Schultz, Student Attorney<br>Brynne Peluso, Student Attorney</td><td>/s/ Joshua Erlich<br>Joshua Erlich, VA Bar No. 81298<br>THE ERLICH LAW OFFICE, PLLC<br>1550 Wilson Blvd., Ste. 700<br>Arlington, VA  22209<br>Tel:   (703) 791-9087<br>Fax:   (703) 722-8114<br>Email: jerlich@erlichlawoffice.com</td></tr>
</table>

/s/ Nicole M. Rheault
Nicole M. Rheault (D.C. Bar No. 1780028)
(*pro hac vice*)
Aderson Francois (D.C. Bar No. 498544) (*pro hac vice*)
Genevieve Mesch (D.C. Bar No. 90008005)
(*pro hac vice*)
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 352
Washington, DC 20001
Phone: (202) 661-6506
Nicole.Rheault@georgetown.edu
Aderson.Francois@georgetown.edu
Genevieve.Mesch@georgetown.edu

*Counsel for Plaintiff*

---

[20] 42 U.S.C. 1988.

[21] Counsel gratefully acknowledges the work of the Student Attorneys in Georgetown Law's Civil Rights Clinic, who played key roles in researching and drafting this Complaint but are not yet admitted pursuant to E.D. Va. Adm. Appendix A. To the extent any student attorney will appear in court, Plaintiff will seek leave as required by Appendix A of the Local Rules.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed electronically with the Clerk of the Court. All defendants represented by the following counsel, who have entered appearance, have been therefore electronically served:

**Taylor Denslow Brewer**
Moran Reeves Conn PC
1211 E. Cary Street
Richmond, VA 23219
804-864-4805
Fax: 804-421-6251
Email: tbrewer@moranreevesconn.com

**Martin Andrew Conn**
Moran Reeves Conn PC
1211 E. Cary Street
Richmond, VA 23219
(804) 421-6250
Fax: (804) 421-6251
Email: mconn@moranreevesconn.com

**Rebecca A. Roberts**
Moran Reeves Conn
1211 E. Cary Street
Richmond, VA 23219
804-864-4850
Fax: 804-421-6251
Email: rroberts@moranreevesconn.com

**John David McGavin**
McGavin, Boyce, Bardot, Thorsen and Katz, P.C.
9990 University Dr.
Ste 400
Fairfax, VA 22030
703-385-1000
Email: jmcgavin@mbbtklaw.com

All other Defendants shall be served with a copy of this amended complaint pursuant to Rule 4 of the Federal Rules of Civil Procedure.

/s/ *Joshua Erlich*

Joshua Erlich (VA Bar No. 81298)

**The Erlich Law Office, PLLC**

1550 Wilson Blvd

Ste 700

Arlington, VA  22209

Tel:    (703) 791-9087

Fax:    (703) 351-9292

Email: jerlich@erlichlawoffice.com

*Counsel for Plaintiff*