IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JEMIKA JOHNSON,                          )
                                         )
              Plaintiff,                 )
                                         )
        v.                               )        1:23-cv-1024 (LMB/WEF)
                                         )
RAPPAHANNOCK REGIONAL JAIL               )
      AUTHORITY, et al.,                 )
                                         )
              Defendants.                )

<u>MEMORANDUM OPINION</u>

Before the Court is defendants' Shawn Connolly, Stephenie Brown, Peter Teye, Paul

Wallace, Tony Coles, Joseph Jackson, Patrick O'Connor, Gregory Coleman, Terrence Shell, and

Rappahannock Regional Jail Authority's (collectively, "defendants") Partial Motion to Dismiss

plaintiff Jemika Johnson's ("plaintiff") Second Amended Complaint ("SAC").  The SAC alleges

that, throughout plaintiff's pre-trial detention at Rappahannock Regional Jail ("RRJ") between

May 19, 2021 and August 3, 2021, jail staff neglected plaintiff's medical and physical needs,

caused both by her schizoaffective disorder and pregnancy, which ultimately resulted in the

death of her son, Baby Boy Johnson, in violation of the Fourteenth Amendment under 42 U.S.C.

§ 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, <u>et seq.</u>; the

Rehabilitation Act ("RA"), 29 U.S.C. § 794(a); and the Affordable Care Act ("ACA"), 42 U.S.C.

§ 18116.

In their Partial Motion to Dismiss, defendants argue that the Court should dismiss most

claims in the SAC because they are time-barred and fail to state a claim upon which relief may

be granted under Fed. R. Civ. P. 12(b)(6).  [Dkt. No. 179] at 1.  In opposition, plaintiff argues

that the SAC plausibly alleges timely claims against defendants and describes actionable

discriminatory conduct.  [Dkt. No. 183] at 3.  For the reasons stated during oral argument and more fully explained within this Memorandum Opinion, defendants' Partial Motion to Dismiss will be denied.

I

## A. <u>Factual Background</u>

The SAC raises no new claims and names no additional defendants; rather, pursuant to the Court's March 22, 2024 Order, plaintiff now brings claims against only (1) Hearing Officers, composed of Shawn Connolly ("Connolly"), Stephenie Brown ("Brown"), and Peter Teye ("Teye") (collectively, "Hearing Officers"); (2) Cell Check Officers, composed of Paul Wallace ("Wallace"), Tony Coles ("Coles"), Joseph Jackson ("Jackson"), and Patrick O'Connor ("O'Connor") (collectively, "Cell Check Officers"); (3) Rappahannock Regional Jail Authority ("RRJA"); and (4) individual officers Gregory Coleman ("Coleman") and Terrence Shell ("Shell").

Hearing Officers were "responsible for evaluating incident reports involving [plaintiff] and over[seeing] disciplinary proceedings against [her]," [Dkt. No. 176] at ¶ 11; Cell Check Officers were "on duty in administrative segregation on August 2, 2021 and into the early morning of August 3, 2021 when [plaintiff] went into labor," id. at ¶ 9; and Coleman and Shell were stationed in administrative segregation and interacted with plaintiff regarding her medical needs during her incarceration at RRJ, id. at ¶ 10.  At all material times, "all [d]efendants were acting under the color of state law, pursuant to their authority as officials, agents, contractors or employees of RRJ." Id. at ¶ 13.

2

### 1. Plaintiff's Incarceration and Mental Health

According to the SAC, on May 19, 2021, plaintiff arrived at RRJ as a pre-trial detainee. Before she was incarcerated at RRJ, plaintiff had been diagnosed with Schizoaffective Disorder.[1] RRJ officers booked plaintiff into the RRJ facility and immediately housed her in an isolated cell in administrative segregation, rather than in a medical unit.  Id. at ¶ 16.

The following day, on May 20, 2021, a classification counselor at RRJ recorded plaintiff's psychological impairment and risk of suicide.  The counselor's notes indicate plaintiff's need for additional medical assessment and monitoring of her physical capacity and emotional stability.  The counselor also recorded plaintiff's need for mental health services and medical services.  Id. at ¶ 17.

Throughout her time at RRJ, plaintiff exhibited signs of psychosis, including delusions, disorganized thoughts, grandiose speech, and breaks with reality.  Id. at ¶ 18.  Plaintiff nevertheless was never medicated during her time at RRJ.  Id. at ¶ 19.  Moreover, defendants "failed to secure treatment for [plaintiff] from a licensed psychiatrist or physician."  Id. at ¶ 21.

On June 21, 2021, RRJ officials administered plaintiff a pregnancy test, and the test came back positive, id. at ¶ 20; however, defendants "failed to secure [plaintiff] a prenatal examination by a qualified physician" and did not provide plaintiff with "information on preparing for labor or her baby's aftercare," id. at ¶ 21.

### 2. Plaintiff's Requests for Medical Assistance Before Labor

All cells at RRJ are equipped with an intercom system that detainees may use to speak with jail officials as well as to request medical assistance.  Id. at ¶ 22.  According to the SAC,

---

[1] The SAC states that "[d]ue to [plaintiff]'s Schizoaffective Disorder and the resulting psychotic break she suffered at times relevant to this Complaint, the vast majority of allegations in this Complaint are derived from records received from RRJ."  [Dkt. No. 176] at 4 n.2.

plaintiff used the intercom system on multiple occasions between the start of her incarceration and the onset of labor to inform RRJ staff that she felt physically unwell, that her basic hygiene needs were not being met, and that she needed medical assistance. Id. at ¶ 23.

Coleman and Shell were on duty in administrative segregation frequently from May 19, 2021 through August 3, 2021. Id. at ¶ 24. As administrative segregation officers, Coleman and Shell were aware that plaintiff was pregnant and provided her with pregnancy snack bags; however, they "ignored or outright denied" plaintiff's requests to see a nurse. Id. at ¶ 26. On more than one occasion, Coleman and Shell refused to provide plaintiff with medical request forms and mocked and harassed her for having made the request. Id. at ¶ 27.

3. Plaintiff's Assignment to Administrative Segregation

The SAC further alleges that Hearing Officers knew of plaintiff's psychological condition and medical needs related to her medical condition. Id. at ¶ 29. On June 3, 2021, an RRJ officer issued a charge sheet against plaintiff for failure to obey orders of jail staff because plaintiff refused to transfer cells. The officer attributed plaintiff's refusal to her mental health. Id. at ¶ 31.

Plaintiff did not participate in the disciplinary hearing related to that charge. Instead, Hearing Officer Connolly read the charge to plaintiff through her cell door. Connolly never provided plaintiff an opportunity for an inmate or staff advisor to assist in her defense before or during the disciplinary hearing on June 7, 2021. Id. at ¶ 32. Connolly found plaintiff guilty of the alleged charge and sentenced her to three days of isolation with restricted privileges. He did not reassess the conditions of plaintiff's confinement either at the disciplinary hearing or after the three days of isolation had passed, and, as a result, plaintiff continued to be held in administrative segregation. Id. at ¶ 34.

On June 16, 2021, officers reported that plaintiff again refused to relocate and charged her with failure to obey orders of jail staff. Id. at ¶ 35. Plaintiff did not participate in the disciplinary hearing related to that second charge. Instead, Hearing Officer Brown read the charge to plaintiff through her cell door. Brown never provided plaintiff an opportunity for an inmate or staff advisor to assist in her defense before or during the disciplinary hearing on June 21, 2021. Id. at ¶ 36. Brown found plaintiff guilty of the charge alleged and sentenced her to three days of isolation with restricted privileges. Brown did not reassess the conditions of plaintiff's confinement either at the time of the disciplinary hearing or after the three days of isolation had passed, and, as a result, plaintiff continued to be held in administrative segregation. Id. at ¶¶ 38-39.

On June 29, 2021, plaintiff received an additional charge from RRJ officers related to her behavior. Hearing Officer Teye postponed a disciplinary hearing on the charge, which was scheduled for July 2, 2021, due to his belief that plaintiff was suffering from an active mental health alert. After postponing the hearing, and despite plaintiff's active mental health alert, Teye left plaintiff in solitary confinement without reassessing her confinement conditions for five more days. Id. at ¶ 42. On July 7, 2021, Teye began a new disciplinary hearing to address the June 29, 2021 charge. Teye read plaintiff the charges and asked her how she wanted to plead. Plaintiff responded in an incoherent manner unrelated to the charges. Id. at ¶ 43. Teye ended the hearing specifically due to plaintiff's "mental health history." He found her guilty based on the officer's report and sentenced plaintiff to time served in administrative segregation. Despite sentencing plaintiff to time served, Teye did not reassess the conditions of plaintiff's confinement either at the time of the disciplinary hearing or throughout the rest of plaintiff's time at RRJ, and, as a result, plaintiff continued to be held in administrative segregation. Id. at ¶ 45.

On July 21, 2021, an RRJ officer reported plaintiff's failure to obey orders to the Institutional Classification Committee, of which Teye is a member. The Institutional Classification Committee conducted a hearing on July 27, 2021 without plaintiff present. Id. at ¶ 47. The Institutional Classification Committee determined that plaintiff should be placed on medical isolation pending a mental health evaluation. Instead of moving plaintiff to a medical isolation cell, Teye ordered plaintiff to remain in administrative segregation, where she remained until going into active labor on August 3, 2021. Id. at ¶ 50.

### 4. Defendants' Observation of Plaintiff

On or about June 28, 2021, medical officials informed jail officials in the administrative segregation area, including Cell Check Officers, that plaintiff was pregnant. Id. at ¶ 51. On several occasions, jail officials in the administrative segregation unit, including Cell Check Officers, provided plaintiff with pregnancy snack bags. Id. at ¶ 52.

On July 27, 2021, RRJ issued a Mental Health Directive requiring mental health observation of plaintiff on thirty-minute intervals. Id. at ¶ 53. Cell Check Officers regularly failed to check on plaintiff in accordance with this directive in the weeks that followed. Even when Cell Check Officers performed these checks, they often would only open and close the window on plaintiff's cell door as they passed but would not look into her cell, engage with her, or respond to her requests. Id. at ¶ 55.

### 5. Birth of Baby Boy Johnson

Plaintiff's water broke on August 2, 2021, just before dinner service. Id. at ¶ 56. Plaintiff informed Cell Check Officers, both directly and through the intercom, that her clothes were wet and that her bedding was soaked; however, her requests for assistance were ignored. Id. at ¶ 56.

According to the shift logs, Cell Check Officer Jackson performed fifteen checks on plaintiff's cell at 6:08 p.m., 6:35 p.m., 7:06 p.m., 7:34 p.m., 7:59 p.m., 8:42 p.m., 9:04 p.m., 9:42 p.m., 10:09 p.m. (at which time Jackson provided plaintiff a pregnancy snack bag), 10:41 p.m., 11:12 p.m., 11:47 p.m., 12:13 a.m., 12:42 a.m., and 1:41 a.m. Id. at ¶ 58. According to the shift logs, Cell Check Officer O'Connor performed a check on plaintiff's cell at 1:15 a.m. Id. at ¶ 59.

At around 02:00 a.m. on August 3, 2021, plaintiff began experiencing severe pain and went into active labor. Plaintiff repeatedly screamed for help but received no attention or response from any of the officers on duty. Id. at ¶ 60. Plaintiff delivered her child alone in her cell. Id. at ¶ 61. At the time of delivery, the newborn child was alive, moving, and looked up at plaintiff. Id. at ¶ 62.

According to shift logs, Jackson performed five checks, in addition to his previous fifteen checks, on plaintiff's cell at 02:39 a.m., 04:04 a.m., 04:36 a.m., 05:18 a.m. (at which point Jackson served plaintiff breakfast), and 05:31 a.m., id. at ¶ 64; O'Connor performed two additional checks on plaintiff's cell at 03:09 a.m. and 03:28 a.m., id. at ¶ 65; Cell Check Officer Coles performed a check on plaintiff's cell at 05:57 am, id. at ¶ 66; and Cell Check Officer Wallace performed two checks on plaintiff's cell at 06:33 a.m. and 06:57 a.m., id. at ¶ 67.

According to shift logs, Wallace performed a check on plaintiff's cell at 07:09 a.m. on August 3, 2021. He found plaintiff and Baby Boy Johnson in her cell, with blood covering the floor and plaintiff's blanket and bedding. Once additional medical staff arrived, they attempted to render medical aid to Baby Boy Johnson but were unsuccessful. Id. at ¶ 72. A staff member called 911 and a Rescue Squad was sent to RRJ, arriving at around 07:30 a.m. Plaintiff and Baby Boy Johnson were separately transported from RRJ to Stafford Hospital, where Baby Boy Johnson was pronounced dead. Id. at ¶ 75.

An autopsy of Baby Boy Johnson revealed evidence that he was born alive, based in part on the finding of a gastric air bubble, although the findings were inconclusive. Id. at ¶ 77. A medical examiner determined the cause of death to be a significant placenta/umbilical cord infection, known as "acute chorioamnionitis and funisitis,"[2] which can result in premature delivery and death. Id. at ¶ 78.

After receiving emergency medical aid at Stafford Hospital, plaintiff was taken to Western State Hospital, a mental health facility in Staunton, Virginia, where she received in-patient care. Western State Hospital received judicial authorization on August 6, 2021 to administer treatment without plaintiff's consent; that authorization ended on February 2, 2022. Id. at ¶ 80.

Records show that, while at Western State Hospital, plaintiff lacked the capacity to make her own medical decisions until about October 8, 2021. Id. at ¶¶ 81-82. Plaintiff remained at Western State Hospital from August 4, 2021 through October 29, 2021, and was treated with antipsychotic medication. Id. at ¶ 83.

As of the date of the SAC, plaintiff is no longer incarcerated and lives independently following her completion of a residential treatment program for her mental health. Id. at ¶ 85.

## B. **Procedural History**

On August 1, 2023, plaintiff filed a seven-count Complaint, alleging that 47 defendants, including 10 "Medical Does" and 10 "Correctional Officer Does," violated her 14th Amendment rights, the ADA, RA, ACA, and state law. [Dkt. No. 1]. On September 27, 2023, plaintiff filed a Motion for Discovery requesting "leave of Court to conduct immediate, limited discovery to

---

[2] Chorioamnionitis is a common infection during pregnancy, typically occurring during prolonged labor. Id. at ¶ 79. Use of broad-spectrum antibiotics during labor and delivery significantly reduces maternal and fetal complications of chorioamnionitis. Id.

assist [p]laintiff in identifying the correct defendants." [Dkt. No. 10].  Specifically, plaintiff sought to serve limited interrogatories on defendant RRJA.  Id. at 1.  The Court granted plaintiff's Motion on October 24, 2023, and ordered RRJA to respond to the limited interrogatories within 15 days.  [Dkt. No. 37].

On November 2, 2023, RRJA filed a Motion to Dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), [Dkt. No. 41] and an Answer [Dkt. No. 43].  On November 15, 2023, defendants Peter C. Ober and Rappahannock Creative Health Care filed a Motion to Dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  [Dkt. No. 55].  On November 16, 2023, plaintiff filed an Amended Complaint.  [Dkt. No. 59].  As a result, defendants withdrew their motions to dismiss, see [Dkt. No. 68], but beginning on January 5, 2024, each defendant filed either a joint or independent Motion to Dismiss.  See [Dkt. Nos. 93, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, 116, 117, 119, 121, 123, 125, 127, 129, 151].  At a hearing held on defendants' motions on March 22, 2024, all but 10 defendants, as well as Claim II (supervisory liability), Claim III (Monell liability), and Claim VII (wrongful death) were dismissed in their entirety, and Claims IV (ADA), Claim V (RA), and VI (ACA) were dismissed against defendants in their individual capacities.  See [Dkt. No. 175].

In response, plaintiff has filed the instant five-count SAC, alleging in Claim I that Hearing Officers violated her 14th Amendment due process rights under 42 U.S.C. § 1983 based on their "assignment and failure to review the assignment of Ms. Johnson to isolated confinement conditions" which plaintiff alleges caused her "mental health to severely deteriorate, and caused her to suffer unassisted labor," [Dkt. No. 176] at 14; in Claim II that Officer Coleman, Officer Shell, and Cell Check Officers violated plaintiff's 14th Amendment rights under 42 U.S.C. § 1983 by failing to provide her with constitutionally adequate medical

9

care, id. at 15; and in Claims III, IV, and V that all defendants violated respectively the ADA, the RA, and the ACA in their official capacities by discriminating against plaintiff based on her schizoaffective disorder, id. at 16-20.

On May 3, 2024, defendants filed their Answer, as well as the pending Partial Motion to Dismiss, seeking to dismiss Claim I (procedural due process),[3] Claim III (ADA), Claim IV (RA), and Claim V (ACA).  The Motion has been fully briefed and oral argument has been heard.

II

### A. Standard of Review

Rule 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555).  "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679).

### B. Statute of Limitations

In their Partial Motion to Dismiss, defendants argue that the two-year statute of limitations bars plaintiff's § 1983 procedural due process claim and that the one-year statute of limitations bars plaintiff's ADA and RA claims.  See [Dkt. No. 179] at 9, 11-12.  In opposition, plaintiff argues that her § 1983 procedural due process claim was timely filed because

---

[3] Defendants' memorandum in support of its Partial Motion to Dismiss states that it challenges Count II, rather than Count I, of the SAC.  This is assumed to be in error, as defendants' argument focuses on plaintiff's claim of procedural due process violations by the Hearing Officers.

defendants' relevant conduct before the death of Baby Boy Johnson on August 3, 2021 falls

within the statute of limitations under the continuing violations doctrine and because plaintiff's

claims must be tolled by 61 days under Virginia law due to her incapacity. [Dkt. No. 183] at 13.

As for the timeliness of her RA and ADA claims, plaintiff argues that those claims were made

cognizable by the ADA Amendments Act of 2008, and as such, are subject to a four-year statute

of limitations. Id. at 16-17.

### 1. Section 1983 Statute of Limitations

Because § 1983 does not provide its own statute of limitations, courts apply the statute of

limitations applicable to personal injury claims in the relevant state. See Nasim v. Warden, Md.

House of Corr., 64 F.3d 951, 955 (4th Cir. 1995). Virginia applies a two-year statute of

limitations to personal injury claims, see Va. Code § 8.01-243(A); however, under Virginia law,

after a claim accrues, the statute of limitations is tolled for any period in which a plaintiff is

incapacitated. See Va. Code § 8.01-229. An incapacitated person is someone a court deems or

has deemed "incapable of receiving and evaluating information effectively or responding to

people, events, or environments to such an extent that the individual lacks the capacity to [] meet

the essential requirements for his health, care, safety, or therapeutic needs." Va. Code § 64.2-

2000.

The SAC alleges that, after Baby Boy Johnson's death on August 3, 2021, plaintiff was

transferred to Western State Hospital on August 4, 2021, where she remained for 86 days. At the

hospital, medical staff concluded that plaintiff lacked the capacity to make her own medical

decisions from August 4, 2021 through October 8, 2021 (61 days). Given her incapacity, the

hospital obtained judicial authorization to administer treatment, including antipsychotic

medication, without plaintiff's consent. Under the Virginia tolling statute, "a person shall be

deemed incapacitated if [s]he is so adjudged by a court of competent jurisdiction, or if it shall otherwise appear to the court or jury determining the issue that such person is or was incapacitated within the prescribed limitation period." Va. Code Ann. § 8.01-229(A)(2)(b). These allegations are sufficient to establish at this point in the litigation that the two-year period in which plaintiff had to file her § 1983 claim was tolled for 61 days, which means she had until August 7, 2023 to file her due process claim. She timely filed her original Complaint on August 1, 2023. Accordingly, plaintiff's procedural due process claim was timely filed.

   Even without tolling plaintiff's claim for 61 days due to incapacitation, her due process claim was timely filed. The Fourth Circuit has held that "[c]onsistent with the[] views expressed by our sister circuits, . . . a prisoner may allege a continuing violation under Section 1983 by identifying a series of acts or omissions that demonstrate deliberate indifference to a serious, ongoing medical need." See DePaola v. Clarke, 884 F.3d 481, 487 (4th Cir. 2018). If a plaintiff "(1) identif[ies] a series of acts or omissions that demonstrate deliberate indifference to [her] serious medical need(s); and (2) places one or more of these acts or omissions within the applicable statute of limitations for personal injury," the statute of limitations does not begin to accrue on a § 1983 claim until "the date, if any, on which adequate treatment was provided." Id.

   The SAC has alleged a continuing violation of plaintiff's 14th Amendment due process rights by claiming that defendants left plaintiff in solitary confinement without affording her adequate disciplinary proceedings or periodic reviews and that, as a result of defendants' "fixed and continued practice" of failing to conduct any meaningful periodic review, plaintiff remained in confinement from June 7 to August 3, 2021. Accordingly, plaintiff has successfully pled that the harms defendants caused her while in the custody of RRJ constituted a continuing violation for which the statute of limitations would not run until the date "any . . . adequate treatment was

provided." See DePaola, 884 F.3d at 487.  Here, adequate treatment was not provided before

August 3, 2021, which again means that the August 1, 2023 filing of the original Complaint was

timely.

     2. RA and ADA

     Plaintiff's ADA and RA claims are similarly not time barred because she filed this action

within the four-year statute of limitations.  Given the similarities between the ADA and the RA,

courts apply the same limitations period to claims under both acts.  Semenova v. Md. Transit

Admin., 845 F.3d 564, 567 (4th Cir. 2017).  Title II of the ADA does not contain a statute of

limitations, and as such, courts must either apply the federal four-year catch-all limitations

period or the state statute of limitations for the most analogous state-law claim; however, the

four-year federal catch-all period applies only to claims arising under statutes enacted after

December 1, 1990.  See A Soc'y Without a Name, for People Without a Home, Millennium

Future-Present v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011).  Defendants argue that because the

ADA was enacted on July 26, 1990, several months before December 1, 1990, the "one-year

limitations period in the Virginia [Rights of Persons with] Disabilities Act applies to ADA

claims brought in Virginia," id. at 348; however, as plaintiff responds, the ADA was amended in

2008 to broaden the definition of disability by expanding coverage and including in the

definition of a covered disability "an impairment that is episodic or in remission" if that

impairment "would substantially limit a major life activity when active."[4]  See ADA

---

[4] The pre-amendment definition of "disability" only included "a physical or mental impairment that substantially limits one or more major life activities."  The ADA, through the ADA Amendments Act, now explicitly lists schizophrenia as a disability that "will, in virtually all cases, result in a determination of coverage" under the ADA.  See 28 C.F.R. § 35.108 (explaining that schizophrenia "substantially limit[s] the major life activities" listed in the ADAAA due to its limitation of brain function).

13

Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified at 42 U.S.C. § 12102).

Accordingly, if a claim of discrimination is "made possible" by the ADA Amendments Act

("ADAAA") rather than the pre-amendment ADA, a plaintiff may invoke the four-year statute of

limitations for both ADA and RA claims.  See Latson v. Clarke, 346 F. Supp. 3d 831, 857-58

(W.D. Va. 2018).  Claims III and IV of the SAC adequately allege sufficient facts about

plaintiff's mental condition to find that they are covered by the ADAAA.  Therefore, plaintiff's

ADA and RA claims are subject to the four-year statute of limitations and were timely filed.

### C. Plausibility of Procedural Due Process Claim

Defendants next argue that the procedural due process claim in Claim I fails because the

SAC has not plausibly alleged that any disciplinary segregation was imposed on plaintiff or that

the process plaintiff was given violated any procedural requirements.  [Dkt. No. 179] at 6.  In

opposition, plaintiff argues that, even if her confinement was administrative rather than

disciplinary, she remained entitled to a level of process that the Hearing Officers failed to

provide.  [Dkt. No. 183] at 4.

"[P]retrial detainees retain a liberty interest in freedom from punishment."  Williamson v.

Stirling, 912 F.3d 154, 181 (4th Cir. 2018).  The level of process to which a pretrial detainee is

entitled depends on whether restrictions are imposed for disciplinary or administrative purposes.

Id. at 175.  The Fourth Circuit has repeatedly affirmed that before a disciplinary restriction is

imposed, a pretrial detainee is entitled to notice of the alleged misconduct, a hearing, and a

written explanation of the resulting decision.  See Dilworth v. Adams, 841 F.3d 246, 252-254

(4th Cir. 2016); Wolff v. McDonnell, 418 U.S. 539, 557-58, 563-65 (1974).  Moreover, "the

inmate facing disciplinary proceedings should be allowed to call witnesses and present

documentary evidence in h[er] defense when permitting h[er] to do so will not be unduly

hazardous to institutional safety or correctional goals.  Id. at 566.  At the same time, "[w]here

such restrictions are imposed instead for administrative reasons, the detainee is owed some

notice of the proposed action and an opportunity to present her views.  In addition, the detainee

must be afforded periodic review of h[er] confinement." Tate v. Parks, 791 F. App'x 387, 390

(4th Cir. 2019).  A restriction imposed for "administrative reasons" includes managerial and

security needs.  Williamson, 912 F.3d at 175.

      As an initial matter, defendants impermissibly rely on facts outside of plaintiff's

allegations in arguing that there was a nonpunitive purpose for their actions.  [Dkt. No. 179] at 6

(arguing Ms. Johnson's placement in isolated confinement arose and continued "pursuant to jail

policies and procedures for inmates who refuse the COVID-19 test and for inmates with mental

health conditions"); Nachman v. Seaford Transfer, Inc., 2018 WL 4186397, at n.7 (E.D. Va.

Aug. 31, 2018) ("The fact that Defendant's arguments rely on facts not presently before the

Court further supports denial of the motion to dismiss.").  Contrary to defendants' argument, the

Court finds that the SAC plausibly alleges that the restrictions to which plaintiff was subject

were disciplinary and, therefore, she is entitled to the procedural requirements recognized by the

Supreme Court in Wolff v. McDonnell, which include "notice, a hearing, and a written

explanation of the resulting decision."  418 U.S. at 557-58.

      In construing the Partial Motion to Dismiss in the light most favorable to plaintiff, at this

stage, the SAC has plausibly alleged that Hearing Officers violated plaintiff's procedural due

process rights as a pre-trial detainee.  The SAC describes the limited process afforded to plaintiff

by Hearing Officers and the extent to which it fell short of the procedural requirements set forth

in Wolff.  See [Dkt. No. 176] at ¶ 32 (Connolly reading a charge of misconduct issued against

plaintiff through her cell door prior to a disciplinary hearing in which she did not participate);

¶ 34 (Connolly not reassessing plaintiff's confinement after her sentenced isolation elapsed);

¶ 36 (Brown reading a charge of misconduct issued against plaintiff through her cell door prior to a disciplinary hearing in which she did not participate); ¶ 39 (Brown not reassessing plaintiff's confinement after her sentenced isolation elapsed). Moreover, it is plausible to infer from the alleged facts that Hearing Officers who were tasked with assigning confinement classifications knew or should have known that plaintiff had mental health issues, especially considering the purported physical manifestations of her disorder. Such knowledge supports a plausible claim that defendants deprived plaintiff of the appropriate notice and hearing due to her lack of the requisite capacity to participate. Accordingly, the due process claim will not be dismissed.[5]

### D. Plausibility of ADA, RA, and ACA Claims

In defendants' last argument, they maintain that plaintiff's ADA, RA, and ACA claims fail because the SAC "fails to provide any factual allegations to support the legal conclusion that [plaintiff] was discriminated against because of her disability." [Dkt. No. 179] at 14. In opposition, plaintiff argues that the SAC "incorporates the factual allegations made throughout and the specific allegations of discriminatory intent made within her ADA and RA sections into her ACA claim, and therefore her claim should be treated as properly pled." [Dkt. No. 183] at 19.

To state a claim for discrimination under the ADA, RA, or ACA a plaintiff must allege that she (1) has a disability, (2) is otherwise qualified to receive a public service, program, or activity, and (3) was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005);

---

[5] Because the SAC plausibly alleges that Hearing Officers' actions violated the procedural due process rights guaranteed to plaintiff under the Fourteenth Amendment, the defense of qualified immunity is inapplicable at this stage of the litigation.

see also 42 U.S.C. § 18116(a) (under the ACA, "an individual shall not, on the ground prohibited

under . . . [section 504 of the RA] be excluded from participation in, be denied the benefits of, or

be subjected to discrimination under, any health program or activity"). A plaintiff "need not

show 'discriminatory animus' to prevail on a claim for damages under Title II of the ADA or

§ 504 of the Rehabilitation Act." Paulone v. City of Frederick, 787 F. Supp. 2d 360, 317, 405

(D. Md. 2011) (citing Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994)).

Disability discrimination includes both "deprivations based on prejudice, stereotypes, or

unfounded fear," Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 287 (1987), as well as

"'thoughtless[] and indifferent[]' discrimination, which arises not out of 'invidious animus' but

rather out 'of benign neglect.'" Basta v. Novant Health Inc., 56 F.4th 307, 315 (4th Cir. 2022)

(quoting Alexander v. Choate, 469 U.S. 287, 295 (1985)).

Here, defendants do not contest that plaintiff has plausibly pled that she suffered from a

disability—schizophrenia—and was otherwise qualified to receive medical and public services

within the RRJ; rather, they argue that plaintiff "does not allege which discriminatory actions the

defendants committed." See [Dkt. No. 179] at 15. Contrary to defendants' claim, the SAC

contains multiple factual allegations supporting plaintiff's discrimination claims, including that

defendants denied or ridiculed plaintiff's request for medical care by performing inadequate

checks on her, disciplining her for conduct directly resulting from her mental health, and

ignoring her when she was in labor between August 2, 2021 and August 3, 2021. At the motion

to dismiss phase, plaintiff has plausibly alleged that defendants' conduct was based on plaintiff's

schizophrenia because prison records support that defendants knew plaintiff had schizoaffective

disorder and ignored her requests for assistance, which means that they failed to provide her

benefits that similarly situated detainees should have received. See, e.g., Thorpe v. Va. Dep't of

17

<u>Corr.</u>, 2020 U.S. Dist. LEXIS 255972, *130, R & R adopted in part, 2021 U.S. Dist. LEXIS

112284 (W.D. Va. June 15, 2021) (providing plaintiffs stated disability-based ADA and RA

claims where they alleged defendants knew their mental health conditions resulted in the very

behavior used to retain them in solitary confinement).  Accordingly, the Second Amended

Complaint has plausibly alleged discrimination under the ADA, RA, and ACA.

III

For these reasons, defendants' Partial Motion to Dismiss [Dkt. No. 178] will be denied by

an Order accompanying this Memorandum Opinion.

Entered this 7 day of June, 2024.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge